UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

Present: The Honorable    JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE

| Andrea Keifer | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**    **(IN CHAMBERS) ORDER RE DEFENDANT SCHNEIDER ELECTRIC USA, INC.'S MOTION TO DISMISS (DKT. 42);**

**DEFENDANTS OPERATION TECHNOLOGY, INC. AND OSISOFT, LLC'S SECOND MOTION TO DISMISS (DKT. 44)**

## I.    Introduction

Power Analytics Corporation ("Plaintiff") brought this action against Operation Technology, Inc. ("Etap"), OSIsoft LLC ("OSI") and Schneider Electric USA, Inc. ("Schneider") (collectively, "Defendants") for patent infringement, antitrust violations, false advertising under federal law, violations of a North Carolina statute that regulates trade practices, conspiracy and several state law torts. Dkt. 1. On June 21, 2016, Plaintiff filed a First Amended Complaint ("FAC"). Dkt. 38. On July 22, 2016, Schneider brought a Motion to Dismiss the non-patent claims ("Schneider Motion"). Dkt. 42. Plaintiff opposed the Motion (Dkt. 53), and Schneider replied (Dkt. 61). On the same day, Etap and OSI brought a Motion to Dismiss the non-patent claims ("Etap Motion"). Dkt. 44. Plaintiff opposed the Motion (Dkt. 54), and Etap and OSI replied (Dkt. 64). On October 26, 2016, this case was transferred here from the District of Delaware. Dkt. 73. On December 16, 2016, Defendants filed a notice of supplemental authority. Dkt. 149. Plaintiff opposed taking notice of this authority. Dkt. 150.

On January 30, 2017, a hearing on all of these matters was held and they were taken under submission. Dkt. 158. For the reasons stated in this Order, both the Schneider Motion and the Etap Motion are **GRANTED** and the non-patent claims in the FAC are **DISMISSED** without prejudice.

## II.    Factual Background

### A.    The Parties

Plaintiff is a Delaware corporation whose principal place of business is in North Carolina. FAC ¶ 1. Plaintiff "is in the business of developing, selling and supporting software products which are used in the operation of electric power distribution systems." *Id.* "Power Analytics' line of products are employed in Power Grid design; control and safety management; the collection, storage and analysis of system data; and the modeling, simulation and visualization of grid operations." *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | | Date | May 10, 2017 |
|---|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | | |

Etap is a California corporation whose principal place of business is here. *Id.* ¶ 2. Etap "develops and sells software products for use with Power Grids, many of which are similar in functionality to those developed and sold by Power Analytics." *Id.* OSI is a Delaware corporation whose principal place of business is also in California. *Id.* ¶ 3. OSI "develops and sells Power Grid data collection and archiving software products for use with Power Grids. OSI sells these products and related services to customers located throughout North America." *Id.* The FAC alleges that "[i]n certain markets these products are sold, pursuant to an exclusive agreement, in conjunction with Etap's products." *Id.* Schneider is a Delaware corporation whose principal place of business is in Massachusetts. *Id.* ¶ 4. "Among other things, Schneider makes and sells software products and a multitude of devices for use with Power Grids. Schneider sells these products and related services to customers located throughout North America." *Id.*

### B. Overview of the Technology

#### 1. Power Grids

"Power Grids are networks composed of transformers, transmission lines, and a variety of other components and devices that move and distribute electric power between supply sources and electricity consuming devices." *Id.* ¶ 13. "Microgrids are smaller-scale Power Grids used for the distribution of electrical power in specific facilities, applications or defined geographic areas." *Id.* The FAC alleges that "Power Grids and Microgrids are employed in power generation facilities, like nuclear power plants, as well as in numerous other facilities that consume large volumes of electrical power. Power Grids comprise numerous Grid Elements and operational components that fall into several general categories." *Id.* The FAC defines "Grid Elements" as devices that are connected physically to Power Grids. *Id.* The FAC alleges that one category of operational components for Power Grids, which Plaintiff produces, consists of "software used in the design of, and the safe, stable and efficient operation and management of, facilities that employ their own Power Grids and/or Microgrids." *Id.* This software is used in facilities including "nuclear power plants, off-shore oil rigs, manufacturing facilities, data centers, military installations, air traffic control centers, and geographic micro grids." *Id.* The FAC defines these products as "Power Grid Design and Management Products." *Id.*

#### 2. Grid Design Products

The FAC alleges that Plaintiff makes and sells Grid Design Products, which "are software programs used in the engineering, design and modelling of Power Grids." *Id.* ¶ 15. It alleges that Grid Design Products "are software applications with functionality that is unique for use in power grids," and that "other software programs are not reasonable substitutes for Grid Design Products." *Id.* ¶ 15. It also alleges that for use in nuclear power generating facilities, some Grid Design Products must be certified by the Nuclear Procurement Issues Committee ("NUPIC"). *Id.* ¶¶ 15, 34. Plaintiff's Grid Design Products are NUPIC-certified. *Id.* ¶ 16. Etap also makes Grid Design Products that are NUPIC-certified and compete with Plaintiff's products. *Id.* ¶ 17.

#### 3. Real Time Products

The FAC alleges that Plaintiff makes and sells Real Time Products, which "are software programs that allow for real time monitoring, modeling, simulation and visualization of events occurring during the operation of Power Grids in a variety of implementations that enables Power Grids to run securely, safely,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

efficiently and without significant interruption." *Id.* ¶¶ 19-20. It also alleges that Real Time Products "are software applications with functionality unique for use in power grids," and "other software programs are not reasonable substitutes for Real Time Products." *Id.* ¶ 19. Etap also makes and sells Real Time Products. *Id.* ¶ 23. The FAC alleges that Plaintiff owns patents that apply to its Real Time Arc Flash Products. *Id.* Consequently, it alleges that these products offer unique functionality that is superior to what is offered by competing Real Time Products, including those sold by Etap. *Id.* ¶¶ 22-23.

The FAC alleges that as part of their functionality, Real Time Products must interact with Historian Software. *Id.* ¶ 24. Historian Software "collects operational and processing data from Grid Elements and stores this information in a time series database historian." *Id.* Plaintiff offers Historian Software. *Id.* ¶ 24. Each of the Defendants offers its own version of Historian Software, each of which competes with Plaintiff's product. *Id.* ¶¶ 24-25. The Real Time Products of Plaintiff and Etap both allegedly interface with third party Historian Software. *Id.*

### C. Overview of the Alleged Relevant Product Markets

#### 1. NUPIC Market

The FAC alleges that one relevant product market is the NUPIC Certified Power Grid Market ("NUPIC Market"). *Id.* ¶ 33. The FAC defines this market "as the market for the sale and servicing of Power Grid Design and Management Products, including Grid Design Products and Real Time Products, to customers who can only purchase NUPIC-certified Power Grid Design and Management Products." *Id.* "The customers for NUPIC-certified Power Grid Design and Management Products are primarily nuclear power generation facilities, other facilities that use or employ nuclear power, and entities who provide design and other services to such nuclear power facilities." *Id.*

The FAC alleges that "[a]ll North American nuclear facilities are members of NUPIC." *Id.* ¶ 34. NUPIC-certified products are identified on NUPIC's approved suppliers list. *Id.* The Nuclear Regulatory Commission "requires that all U.S. nuclear power plants utilize only NUPIC-certified Power Grid Design and Management Products." *Id.* ¶ 36. The FAC alleges that "[t]he NUPIC certification process is costly to the firm seeking certification for its product and requires capital expenditure in the range of $1 million for initial certification. The NUPIC certification process is also lengthy, taking 2-3 years." *Id.* ¶ 37. The FAC also alleges that "the NUPIC certification process presents a barrier to new entrants to the NUPIC Market, in that unless there is a critical level of contestable sales opportunities, firms have no business incentive to pursue a costly NUPIC certification for a particular product." *Id.* It is also alleged that Plaintiff and Etap are the only providers of NUPIC-certified Power Grid Design and Management Products. *Id.* ¶ 38.

The FAC next alleges that "Etap has stated publicly that it has a 97% market share of the NUPIC Market for Power Grid Design and Management Products, with at least 60 of 64 U.S. nuclear power facilities as customers. Etap also has 5 of the 6 Canadian nuclear power facilities and all 3 of the nuclear power facilities in Mexico." *Id.* ¶ 39. It also alleges that "Etap has also publicly stated – falsely – that it has the only Grid Design software product certified by NUPIC." *Id.* The FAC alleges that Plaintiff's Grid Design product is NUPIC certified. *Id.* ¶ 40. It alleges that Plaintiff's Real Time Products are not NUPIC-certified "because the sales opportunities not foreclosed by Etap's and OSI's anticompetitive agreement and Etap's false statements to customers regarding Power Analytics are below the critical level needed to justify the investment required to obtain NUPIC certification." *Id.* ¶ 40. "The geographic market for the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

NUPIC Market is North America." *Id.* ¶ 41. The FAC alleges that the NUPIC market is a no-growth one because "the NRC has not granted a single license for a new nuclear power plant in the past 10 years." *Id.* ¶ 42. "As a result, all of the NUPIC market customers have an installed software platform, which means all sales are either switching out the legacy software or offering software with additional functionality." *Id.*

2.      HR Data Center Market

The FAC alleges that the second relevant product market is the High Reliability Data Center Power Grid Market ("HR Data Center Market"). *Id.* ¶ 43. The FAC defines the HR Data Center Market "as the market for the sale of Power Grid Design and Management Products and related services for the operation of Power Grids for use in Data Centers which require high levels of reliability." *Id.* It alleges that HR Data Centers have self-contained Microgrids that "require and consume substantial amounts of electrical power and must be capable of functioning independent of the large utility Power Grids to which they may be connected, must always be available, and must operate in a safe and secure manner." *Id.* ¶ 44. HR Data Centers allegedly "require advanced Power Grid Design and Management Products due to the critical nature of such facilities and the specification by owners and operators for extremely high levels of guaranteed security and reliability." *Id.* ¶ 47. They allegedly "require the monitoring of Grid Elements and functions; the collection of operating data in 'real time;' and reporting, analysis, modeling and event simulation functions using such 'real time' data." *Id.* Real time data "refers to information which is collected directly from the data center Microgrids and by polling Grid Elements on a continuous basis." *Id.*

The FAC alleges that "HR Data Centers serve government entities, enterprise corporations and large businesses that depend upon HR Data Centers to safely manage and store critical financial, business and personal records, and must maintain uninterrupted operability virtually 100% of the time, requiring high degrees of fault tolerance and system redundancy." *Id.* ¶ 48. The FAC alleges that "[t]he necessity for continuous and stable power supplies and the investments made by HR Data Centers . . . to ensure such reliability creates a heightened and differentiated demand for the Power Grid Design and Management Products supplied by Power Analytics and Etap relative to the range of Power Grid Design and Management Products purchased for other end-use applications (*e.g.*, among continuous process manufacturers)." *Id.* "Such differentiation includes reliance on typically higher-priced Power Grid Design and Management Products and the reliance on products specified by intermediaries – here, EOEMs – rather than product selections made by the end users themselves." *Id.* It also alleges that products made by other suppliers and offered to other end users "have not been shown to be meaningful competitors" because they are less functional and less efficient. *Id.* It also alleges that HR Data Centers require real-time functionality. *Id.*

The FAC alleges that HR Data Centers contract with Electrical System Original Equipment Manufacturers ("EOEMs") for the construction of Power Grids and Grid Elements within newly constructed HR Data Centers. *Id.* ¶ 50. It alleges that "Power Grid Design and Management Products are not sold directly by Power Analytics and Etap to owners or operators of HR Data Centers; rather, such products are sold to Schneider and other EOEMs for resale to General Contractors and/or the owners or operators." *Id.* It alleges that Plaintiff's Real Time Products meet the requirements of HR Data Centers, as do Etap's products. *Id.* ¶¶ 50-51. "The relevant geographic market for the HR Data Center Market is North America." *Id.* ¶ 52.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

### D.   The Alleged Anticompetitive Arrangement Between Etap and OSI

The FAC alleges that "OSI's historian software, PI Systems, has a dominant share of customers in the NUPIC Market." *Id.* ¶ 61. It also alleges that "100% of operating nuclear power generators in Canada and 76% of operating nuclear power generators in the U.S. use PI Systems." *Id.* The FAC alleges that there are high costs to switch historian software. *Id.* ¶ 62. Consequently, once a party purchases one historian software product, it is unlikely to switch to another one. *Id.* It alleges that, as a result, there is no competitive threat to OSI as to its historian software in the NUPIC market. *Id.* The FAC alleges that this makes the vendor of historian software a "critical bridge" "that companies like Power Analytics must access in order to sell their Power Grid Design and Management Products to those potential customers." *Id.* ¶ 63. As a result, the FAC alleges that "[p]rior to 2014, Power Analytics paid OSI to gain access to its PI System code in order to assure that Power Analytics' Power Grid Design and Management Products worked seamlessly with OSI's PI System. Power Analytics achieved that objective." *Id.*

It is also alleged that in 2011, Plaintiff approached OSI and proposed the entry of a non-exclusive cooperative relationship through which OSI would serve as the critical bridge for Plaintiff's products. *Id.* ¶ 64. It alleges that Plaintiff's employee who prepared this proposal joined Etap in 2013, and after that time OSI terminated discussions with Plaintiff. *Id.* On September 22, 2014, the FAC alleges that "Etap and OSI announced an exclusive dealing arrangement, which they euphemistically characterize as a 'strategic partnership.'" *Id.* ¶ 65. The FAC alleges that "OSI offers a variety of partnership arrangements." *Id.* The FAC alleges that Etap is an OEM partner with OSI. *Id.* This means that it will "embed [OSI's] PI System technologies/functionality into [Etap's] own applications, equipment, or systems to deliver a purposely built, pre–integrated solution to the customer." *Id.* The FAC alleges that "[t]his arrangement authorizes Etap to embed one or more of its Power Grid Design and Management Products, including Etap's Real-Time Product, with OSI's PI Historian software into a bundle and sell both to customers, including customers the NUPIC Market." *Id.* ¶ 66. Further, the FAC alleges that "[u]nder this arrangement, OSI also committed to help Etap address new markets." *Id.* The parties to this agreement allegedly agreed to keep it in place for more than a year. *Id.*

The FAC alleges that this agreement is de facto exclusive. *Id.* ¶ 67. This is so for several reasons, including the following:

> First, Etap is the only OEM Partner with OSI that sells power management software that purports to offer real time functionality. Similarly, Etap is the only OEM Partner with OSI that sells NUPIC-certified Grid Design software. Next, notwithstanding OSI's discussions with Power Analytics that predated its announcement of the Etap arrangement summarized above, subsequent to the September 2014 announcement, OSI has refused to serve that "critical bridge" function for Power Analytics. Etap has exploited that refusal to prevent competition on the merits for the business of the customers in the NUPIC Market. As an example, in response to Power Analytics' efforts to convince customers to switch Etap's Grid Design software for Power Analytics' lower-priced, higher-functioning Design Base™ to work with OSI' PI Systems, Etap has told customers that it and OSI are strategically aligned, whereas Power Analytics was a competitor to not only Etap, but also OSI, which made the customer's historian software.

*Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

The FAC alleges that if Plaintiff does not have access to OSI's critical bridge, it does not have a viable method for selling its Grid Design Product to NUPIC customers who use OSI's historian software. Those customers allegedly account for 80% of the NUPIC market. *Id.* ¶ 68. The FAC also alleges that this agreement forecloses Plaintiff from selling its Real Time Product to prospective users who operate within the same market. *Id.* ¶ 69. The FAC also alleges:

> Through the implementation of Etap and OSI's *de facto* exclusive agreement, together with other anticompetitive actions undertaken primarily by Etap, competition from Power Analytics and others has been effectively foreclosed from the NUPIC Market. This conduct has enabled Etap to secure and maintain its admitted monopoly position of over 97% share of the Grid Design sales in the NUPIC Market. Etap and OSI have jointly maintained and increased their monopoly throttlehold on the NUPIC Market, have harmed competition, and have excluded competitors and innovative competing products.

*Id.* ¶ 70.

### E.        The Alleged Anticompetitive Arrangement Between Etap and Schneider

The FAC alleges that "[i]n the HR Data Center Market, Schneider operates as an EOEM for new HR Data Centers. As the EOEM, Schneider is the party responsible for supplying nearly all hardware, software and equipment that will be used in and attached to the Microgrid of the new HR Data Center." *Id.* ¶ 71. This includes Grid Design and Real Time Products. *Id.* The FAC alleges that "Schneider competes with other companies for that EOEM role, including Eaton, Siemens and ABB," and that it "historically has captured more than 60% of the EOEM opportunities related to the construction of HR Data Centers." *Id.* ¶ 72.

The FAC also alleges that only one competitor, Eaton, has a market share of greater than 9%. *Id.* However, Eaton does not present a viable alternative to Plaintiff because Eaton's products compete with those produced by Plaintiff. *Id.* The FAC concludes that "the non-Schneider portion of the market is fragmented, and Schneider's rivals available to Power Analytics lack the capability to offer a significant market alternative." *Id.*

The FAC then alleges that "[c]ompanies like Schneider that have served as EOEMs on previous Data Centers for a particular customer have a competitive advantage over other firms with respect to a new Data Center for that same customer." *Id.* ¶ 73. The FAC alleges that on December 11, 2012, Schneider and Etap announced a cooperative agreement. Its terms included the launch of a module that combined Schneider's Historian Software with Etap's power system management and simulation software, including Power Grid Design and Management Products. *Id.* ¶ 74. The FAC also alleges:

> Subsequent to the announcement of its agreement with Etap, and notwithstanding Power Analytics' previous business dealings with Schneider, Schneider has refused to recommend or use Power Analytics' Grid Design, Real Time and Arc Flash Products in any HR Data Center projects that Schneider has bid on or managed as an EOEM. Schneider's refusal included HR Data Center projects with specifications that could only be satisfied by using Power Analytics' patented technology.

*Id.* ¶ 75.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

The FAC alleges that Schneider's refusal to deal with Plaintiff "supports the conclusion that the agreement is *de facto* exclusive." *Id.* ¶ 76. It alleges that "Schneider agreed to use only Etap's products in all its Data Center projects and other customer Power Grid installations to the exclusion [of] products competitive with Etap's, including Power Analytics products." *Id.* It is also alleged that the agreement has an indefinite term, because Schneider has refused to use or recommended Plaintiff's products. *Id.* The FAC also alleges that

> Schneider's dominant market share at the EOEM level of the HR Data Center Market means the cumulative impact of the Etap/Schneider exclusive dealing arrangement has relegated Power Analytics to Schneider's EOEM competitors, all of which lack the viability to pose a real threat to Schneider's and Etap's dominant position in the HR Data Center Market. Further, the manner in which these markets operate precludes direct sales by Power Analytics as a viable alternative method of distribution. This arrangement has injured competition and foreclosed competitors, including Power Analytics, from a substantial share of commerce in the supply of Power Grid Design and Management Products, including Power Analytics' innovative and superior patented Real Time Products and Arc Flash Products, to the HR Data Center Market.

*Id.* ¶ 77.

### F.     Additional Alleged Anti-Competitive Conduct

The FAC avers that Defendants engaged in willful infringement of Plaintiff's patents. *Id.* ¶¶ 78-85. Further, the FAC alleges that "Etap undertook a scheme to undermine Power Analytics' marketing efforts and strategy by improperly and unlawfully acquiring Power Analytics' confidential business plans, propriety business information concerning its customers, and product development and software designs, among other things, for the benefit of Defendants." *Id.* ¶ 86. It alleges that Etap hired former employees of Plaintiff and induced them to breach the confidentiality provisions of their employment contracts by disclosing Plaintiff's confidential business information. *Id.* ¶¶ 87-91. It alleges that Plaintiff made Etap aware of the confidentiality agreement, but Etap still induced the employee to breach their obligations by revealing confidential business information. *Id.* ¶¶ 93-94.

The FAC also alleges that "Defendants have unlawfully engaged in deceptive trade practices, including false advertising, business disparagement, and false statements in the contract bidding process for both commercial and government procurements." *Id.* ¶ 102. It alleges that Etap falsely claimed that it offered the only power system analysis software approved for use in nuclear/high-impact facilities. This claim is alleged to be false because Plaintiff's Grid Design Product is NUPIC certified. *Id.* ¶ 103. It also alleges that Etap has made false claims when bidding on contract opportunities by stating that it can lawfully meet customer requirements. However, to do so would require that it infringe Plaintiff's patents. *Id.* ¶ 104. For example, the FAC alleges that

> Chevron Corporation issued a Request for Proposal, ("RFP") with precise technical specifications that included "real-time" functionality requirements for the Power Grid Design and Management Products to be employed in a proposed new data center facility. A review of the Chevron RFP reveals that the specifications enumerated by Chevron were written

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | | Date | May 10, 2017 |
|---|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | | |

to mirror Power Analytics' published specifications for its Real Time Product, Paladin®
Live™. Although, on information and belief, Etap knew that it was not able to meet Chevron's
specifications, and to do so it would necessarily infringe Power Analytics patents, Defendants
Etap and Schneider responded to the RFP, representing that they could meet all of Chevron's
specifications, and won the Chevron contract.

*Id.*

The FAC also alleges "Etap and OSI's stranglehold on the NUPIC market, aided by their collusive and
deceptive practices, has made it impossible for Power Analytics to gain the scale of sales necessary to
obtain NUPIC certification for, and offer for sale, Power Analytics' innovative and advanced Real Time
Products to the nuclear industry." *Id.* ¶ 107.

### G.    Claims Asserted in the FAC

#### 1.    Federal Claims

The FAC alleges that Defendants infringed four of Plaintiff's patents. *Id.* ¶¶ 109-74. In addition, the FAC
asserts violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act,
15 U.S.C. § 14, and the Lanham Act, 15 U.S.C. 1125(a).

##### a)    Sherman Act Section 1

Defendants allegedly violated Section 1 of the Sherman Act through the agreements between Etap and
OSI and Etap and Schneider. *Id.* ¶¶ 176-77. The FAC alleges that the

agreements described in this Complaint have had a direct, substantial adverse effect on
competition in the relevant antitrust markets defined above, including (i) foreclosing
competition from lower cost, higher quality products and services in those markets;
(ii) reducing customer choice within those markets; and (ii) foreclosing innovation in those
markets, specifically Power Analytics' patented technology, and (iv) reducing consumer
welfare through the above adverse effects.

*Id.* ¶ 179.

The FAC alleges that through the OSI–Etap Agreement, Etap has foreclosed access to NUPIC
customers. *Id.* ¶ 180. Thus, it is alleged that

Etap is the only seller of Grid Design and Real Time Products authorized to (i) embed those
products in OSI's PI System historian software offerings; and (ii) offer OSI PI System
historian software in combination with Etap Real Time Products. Given the dominant share
of OSI's PI System among installed historian software platforms in the NUPIC market, the
arrangement has foreclosed competitors of Etap's Grid Design Product, including Power
Analytics, from over 80% of the NUPIC market. That foreclosure, in turn, has rendered
that portion of the market unavailable to Power Analytics' Real Time™ product. But for this
foreclosure, Power Analytics would be able to compete with Etap on the merits of their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

respective Grid Design Products, which in turn would transform NUPIC customers into contestable opportunities for Power Analytics' Real Time™ software.

*Id.*

The FAC alleges that, through the Schneider–Etap Agreement, Etap has foreclosed access to the HR Data Center Market. *Id.* ¶ 181. It also alleges that "Schneider offers only Etap's Grid Design and Real Time Products for HR Data Centers projects for which Schneider acts as EOEM. But for this arrangement, Power Analytics would be able to compete with Etap on the merits of their respective Grid Design and Real Time Products for the HR Data Center business." *Id.* The FAC then alleges that "Defendants have no *bona fide* pro-competitive justifications for these anticompetitive agreements, and any business justifications for these agreements are decidedly outweighed by the agreements' adverse effect on competition in the relevant markets, given OSI's and Schneider's 'critical bridge' positions." *Id.* ¶ 182.

### b) Section 2 of the Sherman Act

The FAC also alleges violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, through the monopolization and attempted monopolization of the NUPIC Power Grid market, and attempted monopolization of the HR Data Center market. The FAC alleges that Etap has monopoly power in the NUPIC market for Power Grid Design Products because it holds a 97% market share. *Id.* ¶ 198. It also alleges that Etap has the power to control prices and exclude competition through its ability to sell its lower quality, higher priced products and its exclusive agreements with OSI and Schneider. *Id.* It is also alleged that "Etap has maintained and furthered its monopoly power through the exclusionary, predatory and unlawful business practices described above, including, patent infringement. These acts constitute the willful maintenance of monopoly power." *Id.* It alleges that both Plaintiff and competition have been harmed as a result. *Id.* ¶¶ 201-02. The FAC also alleges that "Etap has engaged in the predatory conduct described above with a specific intent to monopolize the NUPIC Power Grid Market for Power Grid Design Products with a dangerous probability of success." *Id.* ¶ 204.

The FAC further alleges that "Etap's Grid Design Product has a market share of the HR Data Center Market of at least 50%. Etap has engaged in the predatory conduct described above with a specific intent to monopolize the HR Data Center Market for Grid Design and Management Products with a dangerous probability of success." *Id.* ¶ 210. It alleges that this conduct has caused harm both to Plaintiff and competition within the relevant market. *Id.* ¶¶ 213-14.

### a) Clayton Act Section 3

The FAC also alleges that Etap violated Section 3 of the Clayton Act, 15 U.S.C. § 14. *Id.* ¶¶ 188-96. It alleges that "[t]he agreement between Etap and Schneider works to condition the sale of Etap's Grid Design and Real Time products Schneider's commitment not to use or deal in the products of another seller, including Power Analytics, in one or more of the relevant markets." *Id.* ¶ 189. This agreement is alleged to have had an adverse effect on competition without any offsetting, pro-competitive benefits. *Id.* ¶¶ 190-92. It is also alleged to have reduced Plaintiff's sales volume and foreclosed Plaintiff from competing within a substantial part of the relevant market. *Id.* ¶ 193.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

   b)  Lanham Act

The FAC alleges that Etap has engaged in false advertising in violation of the Lanham Act, 15 U.S.C. 1125(a). It allegedly did so through statements about NUPIC certification and those to the effect that it could lawfully fulfill contracts, when to do so required the infringement of Plaintiff's patents. *Id.* ¶ 216. Plaintiff was allegedly harmed by these actions. *Id.* ¶¶ 217-19.

   2.  <u>State Law Claims</u>

The FAC alleges that Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1. *Id.* ¶ 221. Thus, it is alleged that

> Defendants' (1) infringement of Power Analytics' patents; (2) false statements made to customers and in the bidding of contracts; (3) business and product disparagement; (4) false statements and advertising; (4) inducement of the breach of employee confidentiality agreements and theft of trade secrets; and (5) agreements in restraint of trade and to foreclose or exclude competition are, individually and collectively unfair and deceptive trade practices under North Carolina law.

*Id.* ¶ 222.

The FAC also alleges that Etap induced the breach of a contract and thereby stole trade secrets. *Id.* ¶¶ 225-29. The FAC alleges that Etap induced its former employees to breach their respective confidentiality agreements with Plaintiff and disclose Plaintiff's confidential business information to Etap. *Id.* It alleges that these actions constituted tortious interference with Plaintiff's contractual relations with these former employees. *Id.* ¶¶ 230-33. The FAC also brings a parallel claim for tortious interference with prospective economic advantage. *Id.* ¶¶ 234-37. Finally, the FAC advances a related claim for civil conspiracy. *Id.* ¶¶ 238-43.

**III.**  <u>**Analysis**</u>

  **A.**  **Legal Standard**

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).

Pursuant to Fed. R. Civ. P. 12(b)(6), a party may bring a motion to dismiss a cause of action that fails to state a claim. It is appropriate to grant such a motion only where the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

true and must be construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Sciences Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). "Moreover, the Supreme Court has cautioned against permitting antitrust cases to proceed to discovery without a plaintiff demonstrating 'plausibility' because of the high cost of discovery in antitrust cases in particular." *Pro Search Plus, LLC v. VFM Leonardo, Inc.*, No. SACV 12-2102-JST ANX, 2013 WL 3936394, at *1 (C.D. Cal. July 30, 2013); *see also Twombly*, 550 U.S. at 558 ("Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." (citation omitted))

### B.    Application

1.    <u>Antitrust Claims</u>

a)    Sherman Act Section 1

Section 1 of the Sherman Act, 15 U.S.C. §§ 1, 15, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) (quoting 15 U.S.C. § 1). "Despite the breadth of the statutory language, the Supreme Court 'has long recognized that Congress intended to outlaw only unreasonable restraints.'" *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016) (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997)). "To establish liability under § 1, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was in unreasonable restraint of trade." *Id.* (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189-90 (2010)).

Plaintiffs contend that the allegations of the FAC are sufficient to state such a claim. The FAC alleges that Etap entered separate agreements with OSI and Schneider each of which unreasonably restrains trade. FAC ¶¶ 176-77. To support this claim, the FAC alleges that these agreements unreasonably restrained trade by "(i) foreclosing competition from lower cost, higher quality products and services in those markets; (ii) reducing customer choice within those markets; and (ii) foreclosing innovation in those markets, specifically Power Analytics' patented technology, and (iv) reducing consumer welfare through the above adverse effects." *Id.* ¶ 179. It alleges that through its agreement with Etap, "Schneider offers only Etap's Grid Design and Real Time Products for HR Data Centers projects for which Schneider acts as EOEM." *Id.* ¶ 181. OSI's agreement with Etap allegedly constitutes an unreasonable restraint because OSI controls 80% of the NUPIC market and the agreement provides that "Etap is the only seller of Grid Design and Real Time Products authorized to (i) embed those products in OSI's PI System historian software offerings; and (ii) offer OSI PI System historian software in combination with Etap Real Time Products." *Id.* ¶ 180.

Defendants contend that the FAC fails plausibly to allege the existence of an exclusive dealing arrangement, a relevant market, and harm to competition. OSI and Etap also argue that Plaintiff lacks antitrust standing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

(1)       Exclusive Dealing Arrangements

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010). "The main antitrust objection to exclusive dealing is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the term of the agreement." *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (footnote omitted) (citing *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 393 (7th Cir. 1984) (Posner, J.)). There are "well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition." *Id.* "[A]n exclusive-dealing arrangement does not constitute a per se violation of section 1." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676 F.2d 1291, 1303-04 (9th Cir. 1982). This is because "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.); *see also ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012) ("Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally pose little threat to competition."). Therefore, "the rule of reason rather than a per se analysis" is applied to exclusive dealing arrangements. *Aerotec Int'l*, 836 F.3d at 1181 n.2. "Under the antitrust rule of reason, an exclusive dealing arrangement violates Section 1 only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'" *Allied Orthopedic Appliances*, 592 F.3d at 996 (quoting *Omega*, 127 F.3d at 1162); *see also Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.").

"[A] prerequisite to any exclusive dealing claim is an agreement to deal exclusively." *ZF Meritor*, 696 F.3d at 270. For a de facto exclusive dealing claim, "a plaintiff must still show that contracts that were induced were exclusive rather than run-of-the-mill contracts, which inevitably foreclose or exclude alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Aerorec Int'l*, 836 F.3d at 1181 (internal quotation marks and alterations omitted). Courts may focus on the terms of the agreement to determine if it has the de facto effect of being an exclusive arrangement. *See id.* (listing examples of terms in exclusive arrangements as including "requirements terms, . . . volume or market share targets, or long-term contracts that prevent meaningful competition by taking potential purchasers off the market" (citations omitted)); *see also id.* at 1182 ("In certain limited situations, discounts and rebates conditioned on a promise of exclusivity or on purchase of a specified quantity or market share of the seller's goods or services may be understood as 'de facto' exclusive dealing contracts because they coerce buyers into purchasing a substantial amount of their needs from the seller.").

The Ninth Circuit has "not explicitly recognized a 'de facto' exclusive dealing theory," but has not rejected the theory either. *Id.* Plaintiff has not plausibly alleged the existence of de facto exclusive dealing agreements and has not plausibly alleged that the agreements have the effect of "foreclose[ing] competition in a substantial share of the line of commerce affected." *Omega*, 127 F.3d at 1162.

(a)       Schneider–Etap Agreement

Plaintiffs argue that the Etap–Schneider agreement is de facto exclusive because "Schneider has refused to recommend or use Power Analytics' Grid Design, Real Time and Arc Flash Products in any HR

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | SA CV16-01955 JAK (FFMx) | | Date | May 10, 2017 |
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | | |

Data Center projects that Schneider has bid on or managed as an EOEM. Schneider's refusal included HR Data Center projects with specifications that could only be satisfied by using Power Analytics' patented technology." FAC ¶¶ 75-76. Further, the FAC alleges that "Schneider agreed to use only Etap's products in all its Data Center projects and other customer Power Grid installations to the exclusion [of] products competitive with Etap's, including Power Analytics products. This agreement has an indefinite term, and still in effect given Schneider's uninterrupted refusal to use or recommend Power Analytics' products 42 months later." FAC ¶ 76.

Defendants argue that Plaintiff's exclusive dealing claim fails because the FAC does not contain any factual allegations as to the means by which the agreements operate as de facto exclusive. They argue that the agreements are not expressly exclusive, which Plaintiff implicitly concedes by alleging only de facto exclusivity. They argue that, for the agreements to be deemed de facto exclusive, Plaintiff must allege some terms in the agreement that operate to make them so.

The FAC does not plausibly allege the existence of a de facto exclusive dealing agreement between Schneider and Etap. Its allegations are conclusory. Thus, it does not present allegations specific to exclusivity such as "requirements terms, . . . volume or market share targets, or long-term contracts that prevent meaningful competition by taking potential purchasers off the market." *Aerorec Int'l*, 836 F.3d at 1181 (citations omitted). Further, in opposing the Motion, Plaintiff has neither provided any examples of any applicable mechanisms nor cited any case that holds that such specificity is not required in pleading de facto exclusivity.

Plaintiff has cited the allegations in the FAC that Schneider and Etap announced a cooperative agreement to bundle an Etap software product and one of Schneider's products, that since the entry of this agreement, Schneider "has refused to recommend or use" Plaintiff's products in any HR Data Center projects, "notwithstanding Power Analytics' previous business dealings with Schneider." FAC ¶¶ 74-75. These allegations are insufficient plausibly to state a claim for de facto exclusive dealing. For example, the FAC does not plausibly allege why that agreement prevents Schneider and Plaintiff from entering a similar bundling agreement. Nor are there allegations as to why the claimed agreement is unreasonable. There could be other reasons why Schneider has elected not to do business with Plaintiff, and these may be sufficient to satisfy the rule of reason.

The FAC does allege that there were "previous business dealings" between Plaintiff and Schneider. It does not, however, provide any allegations as to the nature of those dealings, and how they relate to the claimed exclusivity. FAC ¶ 75. In light of the foregoing, it is not plausible to draw the inference that that Schneider has refused to do business with Plaintiff due to a de facto exclusive dealing arrangement with Etap. *See, e.g.*, *Pro Search Plus*, , 2013 WL 3936394, at *4 ("while the case law does support the general proposition that a de facto exclusive dealing arrangement can run afoul of the antitrust laws, Pro Search has not alleged anything beyond the existence of the contracts to support its apparently broader 'de facto arrangement' theory."). Without more, a refusal to deal is not an antitrust violation. *See Aerotec Int'l*, 836 F.3d at 1184 ("As the Supreme Court has repeatedly emphasized, there is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals.'" (quoting *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 457 (2009))).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

(b)  OSI–Etap Agreement

Plaintiff next argues that the agreement between OSI and Etap is a de facto exclusive dealing arrangement. FAC ¶¶ 65-67. OSI and Etap allegedly announced a strategic partnership on September 22, 2014. *Id.* ¶ 65. "This arrangement authorizes Etap to embed one or more of its Power Grid Design and Management Products, including Etap's Real-Time Product, with OSI's PI Historian software into a bundle and sell both to customers, including customers the NUPIC Market." *Id.* ¶ 66. The FAC alleges that the OSI–Etap agreement is de facto exclusive for the following reasons:

> First, Etap is the only OEM Partner with OSI that sells power management software that purports to offer real time functionality. Similarly, Etap is the only OEM Partner with OSI that sells NUPIC-certified Grid Design software. Next, notwithstanding OSI's discussions with Power Analytics that predated its announcement of the Etap arrangement summarized above, subsequent to the September 2014 announcement, OSI has refused to serve that "critical bridge" function for Power Analytics. Etap has exploited that refusal to prevent competition on the merits for the business of the customers in the NUPIC Market. As an example, in response to Power Analytics' efforts to convince customers to switch Etap's Grid Design software for Power Analytics' lower-priced, higher-functioning Design Base™ to work with OSI' PI Systems, Etap has told customers that it and OSI are strategically aligned, whereas Power Analytics was a competitor to not only Etap, but also OSI, which made the customer's historian software.

*Id.*

These allegations are not sufficient plausibly to allege an exclusive dealing arrangement between OSI and Etap for reasons parallel to those stated above with respect to the alleged agreement between Schneider and Etap. The FAC alleges that OSI is a critical bridge to the NUPIC market because more than 80% of existing NUPIC facilities use OSI's base historian software. This allegedly makes it very unlikely that they would switch to a different historian software due to the high cost of doing so. FAC ¶ 62. As with the alleged Schneider–Etap agreement, the FAC does not allege any specific terms of this agreement that make it de facto exclusive. Instead, the FAC alleges only that OSI has not partnered with Plaintiff. Given the absence of some specificity as to the challenged agreement and its effect, the FAC does not plausibly allege exclusivity. *Aerotec Int'l*, 836 F.3d at 1183 ("Just as in any exclusive dealing claim, however, the court first had to be satisfied that specific features of the agreement required exclusivity.").

No more persuasive is Plaintiff's argument that the FAC plausibly states a de facto exclusive dealing arrangement with respect to both agreements because Schneider and OSI serve as "critical bridges" to their respective markets. Plaintiff has provided no precedent to support the claim that the presence of a "critical bridge" is sufficient to establish the basis for a claim of de facto exclusive dealing in violation of the Sherman Act. The cases on which Plaintiff relies for a different outcome involved specific terms in the agreements or particular conduct by the defendants with respect to critical bridges. It was these additional contentions together with the claim of a critical bridge that permitted the inference or finding of anticompetitive conduct. *See LePage's, Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) ("The anticompetitive effect of 3M's exclusive dealing arrangements, whether explicit or inferred, cannot be separated from the effect of its bundled rebates. 3M's bundling of its products via its rebate programs reinforced the exclusionary effect of those programs."); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190 (3d Cir. 2005) (agreements

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

between supplier of artificial teeth and its dealers were de facto exclusive because supplier would not permit a dealer that carried its artificial teeth to sell competitive products without losing access to the entire line of the supplier's dental products).

For the foregoing reasons, the FAC does not plausibly allege the existence of de facto exclusive dealing arrangements between or among any of the Defendants.

(2)    Preclusion from a Relevant Market

Defendants argue that, even if the FAC plausibly alleged the existence of exclusive dealing arrangements, it does not allege that these arrangements foreclosed competition in a relevant market, as required to state claim under Section 1. "A restraint violates the rule of reason if the restraint's harm to competition outweighs its procompetitive effects. The plaintiff bears the initial burden of showing that the restraint produces significant anticompetitive effects within a relevant market." *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (internal quotation marks and citations omitted). Defendants also argue that the Section 1 claim fails because the FAC does not plausibly allege that the agreements between Defendants create significant anticompetitive effects that preclude Plaintiff from selling in the relevant market. Defendants contend that the alleged relevant market is unduly narrow and implausible. Defendants also argue that the FAC has not plausibly alleged that the challenged agreements have created anticompetitive effects.

"The term relevant market encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the area of effective competition ... where buyers can turn for alternate sources of supply." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988) (internal quotation marks omitted). And, "[t]he product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id.* "The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations." *Omega*, 127 F.3d at 1162 (quoting 2A Phillip E. Areeda et al., *Antitrust Law* ¶ 570b1 (1995)). Although "[d]efining the relevant market is a factual inquiry ordinarily reserved for the jury," *Oltz*, 861 F.2d at 1446, "[f]ailure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka*, 252 F.2d at 1063.

(a)    Schneider–Etap Agreement

Defendants argue that the relevant market alleged in the FAC is implausible because it is too narrow. The challenged product market is defined as one in which power grid design and management products are used in HR Data Centers. Defendants contend that the relevant product market is larger and includes all power grid design and management products that are used in similar power grids and microgrids. Plaintiff contends that the FAC plausibly alleges that the market for HR Data Centers is distinct from other markets and may properly deemed a sub-market. The FAC makes the following allegations about the unique requirements of HR Data Centers:

> These require advanced Power Grid Design and Management Products due to the critical nature of such facilities and the specification by owners and operators for extremely high levels of guaranteed security and reliability. Specifically, HR Data Centers require the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

monitoring of Grid Elements and functions; the collection of operating data in "real time;" and reporting, analysis, modeling and event simulation functions using such "real time" data.

FAC ¶ 47.

> The necessity for continuous and stable power supplies and the investments made by HR Data Centers – in particular Tiers 3 and 4 – to ensure such reliability creates a heightened and differentiated demand for the Power Grid Design and Management Products supplied by Power Analytics and Etap relative to the range of Power Grid Design and Management Products purchased for other end-use applications (*e.g.*, among continuous process manufacturers). Such differentiation includes reliance on typically higher-priced Power Grid Design and Management Products and the reliance on products specified by intermediaries – here, EOEMs – rather than product selections made by the end users themselves.

FAC ¶ 48.

The FAC defines Power Grid Design and Management Products as "software used in the design of, and the safe, stable and efficient operation and management of, facilities that employ their own Power Grids and/or Microgrids, such as nuclear power plants, off-shore oil rigs, manufacturing facilities, data centers, military installations, air traffic control centers, and geographic micro grids." FAC ¶ 13. Further, the FAC cites Etap's website and guide to those products that compete with Plaintiff's products and are the subject of the alleged agreements. *See id.* ¶ 17 (citing http://etap.com/Documents/Download%20PDF/etapproduct-overview-HQ-2015.pdf). That guide lists several potential customers for those specific products, including: "commercial offices, retail parks, industrial complexes, mission critical facilities, data centers, university campuses, offshore facilities, and ship systems." *See* http://etap.com/Documents/Download%20PDF/etapproduct-overview-HQ-2015.pdf at 12.

Defendants argue that it is not plausible to allege that HR Data Centers are the only type of facility that has a power grid or microgrid requiring continuous and stable power supplies and heightened reliability. Defendants contend that Plaintiff's position is also inconsistent with the reference in the FAC to such other facilities. Defendants contend that it is implausible that those who operate these other facilities do not share the same concerns as those who are within Plaintiff's proposed product market. This includes potential customers such as nuclear power plants, military installations or air traffic control centers.

The FAC does not allege that Plaintiff's Power Grid Design and Management Products sold to HR Data Centers are different from those sold to other entities. However, it appears that Etap sells or licenses the same products to HR Data Centers and other customers. Further, the FAC does allege that some of Plaintiff's products, specifically "Real Time Products," are sold to NUPIC customers in addition to HR Data Centers. FAC ¶¶ 33, 40, 80. At the hearing, Plaintiff's counsel confirmed that these same products are sold to other customers. Defendants argue that, for these reasons, the FAC does not plausibly allege that "products sold to HR Data Centers" is a valid relevant submarket, as opposed to a market containing all customers for those particular products.

Plaintiff's definition of the relevant market as only that for products sold to HR Data Centers is not adequately supported by the allegations in the FAC. "While a relevant product market can be limited to a portion of customers, such a limitation must be based on a distinction in the product sold to those customers." *T.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | | Date | May 10, 2017 |
|---|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | | |

*Harris Young & Assocs., Inc. v. Marquette Elecs., Inc.*, 931 F.2d 816, 824 (11th Cir. 1991). Plaintiff has provided no plausible explanation for a distinction in its products sold to HR Data Centers as opposed to the identical products it sells to other customers who want a similar level of reliability in their power grid design and management software. *See Dominick v. Collectors Universe, Inc.*, No. 2:12-CV-04782-ODW, 2012 WL 6618616, at *5 (C.D. Cal. Dec. 18, 2012) ("But Plaintiffs misunderstand that a market is defined by *products,* not by *users* of those products."). The allegation that HR Data Centers all require products with real time functionality is not itself sufficient to establish that they comprise a submarket. *Id.* ¶ 48. The FAC does not allege that other customers do not also require products with real time functionality. Nor does it allege that Plaintiff's Real Time Products are only sold to and used by HR Data Centers.

The cases on which Plaintiff relies for a contrary outcome as to a product submarket do not apply based on the allegations of the FAC. They turn on unique characteristics of the products, services or distribution chains, not solely on the alleged needs of a particular customer. "Competitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more." *Omega*, 127 F.3d at 1163. The FAC does not plausibly allege that the agreements operate to exclude Plaintiff from the entire market for its products, as opposed to a subset of potential customers. The FAC does not contain allegations about how the differences in the products sold to these customers plausibly makes HR Data Centers a distinct submarket. Therefore, because the allegations of the FAC are not sufficient as to Plaintiff's foreclosure from the relevant product market, the Motion is granted as to the Section 1, without prejudice.

(b)      OSI–Etap Agreement

Defendants next argue that the FAC fails because does not adequately allege a relevant market with respect to the claims against OSI and Etap. The FAC defines that market as Power Grid Design and Management Products that are used in grid installations for NUPIC customers. For similar reasons to those just discussed, the allegations of the FAC do not plausibly allege a NUPIC market or that Plaintiff has been excluded from it. As with the HR Data Center market, the FAC does not plausibly allege that these other types of facilities would not purchase the same products as those sold in the NUPIC market. *See* FAC ¶ 13. Further, the same software products are alleged to be foreclosed from the NUPIC market by the OSI–Etap agreement, as those foreclosed from the HR Data Center market by the Schneider–Etap agreement. *Id.* ¶¶ 14, 15, 19, 24, 33, 43, 47, 50. Therefore, the FAC itself alleges that these products can be used by and are marketed to different customers. Further, elsewhere in the FAC it is alleged that, as part of the alleged agreement between OSI and Etap, "OSI also committed to help Etap address new markets." *Id.* ¶ 66. Thus, the FAC can be interpreted to allege that the relevant products can be sold outside of the claimed NUPIC market.

Even if the relevant product market were plausibly alleged only as to NUPIC customers, the FAC does not adequately allege that Plaintiff has been foreclosed from this market. Plaintiff's exclusive dealing theory relies on the allegations that OSI serves as a "critical bridge" to customers, and without a partnership with OSI, Plaintiff cannot sell its products to customers that use OSI historian software. *Id.* ¶ 68. However, the allegations in the FAC suggest that Plaintiff is not foreclosed from selling its products to customers who use OSI historian software. The FAC alleges that Plaintiff previously worked with OSI to integrate its products with OSI's historian software. *See id.* ¶ 63 ("Prior to 2014, Power Analytics paid OSI to gain access to its PI System code in order to assure that Power Analytics' Power Grid Design and Management Products worked seamlessly with OSI's PI System. Power Analytics achieved that objective.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

The FAC also alleges that Plaintiff is able to negotiate directly with customers. *See id.* ¶ 67 ("As an example, in response to Power Analytics' efforts to convince customers to switch Etap's Grid Design software for Power Analytics' lower-priced, higher-functioning Design Base™ to work with OSI' PI Systems, Etap has told customers that it and OSI are strategically aligned, whereas Power Analytics was a competitor to not only Etap, but also OSI, which made the customer's historian software.").

The FAC alleges that Etap has leveraged its partnership with OSI in an attempt to persuade customers not to switch to Plaintiff's products. However, it does not allege that it was Etap's strategic alignment with OSI that prevented Plaintiff from convincing customers to switch. Further, the FAC does not allege that the customers were prevented from switching to Plaintiff's products. For example, there is no allegation that OSI would not provide access to OSI's historian software to customers who opted to use products other than those provided by Etap.

*            *            *

For the foregoing reasons, the FAC fails plausibly to allege that Plaintiff is foreclosed from competition in a relevant market by either of the alleged exclusive dealing arrangements among the Defendants.

(3)    Harm to Competition

Defendants also argue that the FAC does not plausibly allege that Defendants' conduct has caused anticompetitive effects or that there has been harm to competition as opposed to merely harm to Plaintiff. "Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *ZF Meritor*, 696 F.3d at 284. Defendants contend that the FAC fails plausibly to allege harm to competition for several reason. *First,* it does not adequately allege that Etap, the rival supplier of power grid design and maintenance products, has significant market power. *Second,* it does not sufficiently allege that Schneider or OSI was coerced into the exclusive dealing arrangements. *Third,* there are no allegations that Schneider or OSI cannot readily terminate the agreements. *Finally,* the allegations that Plaintiff has been foreclosed from selling to certain customers only demonstrate harm to a competitor, not to competition.

For the reasons stated above, the FAC does not plausibly allege the claimed relevant market. Similarly, the FAC does not contain sufficient allegations as to the market power of Etap or any of the Defendants. Without doing so, Plaintiff cannot demonstrate harm to competition. The FAC also fails plausibly to plead antitrust injury.

(a)    Coercion and Ease of Termination

As noted, "[e]xclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *ZF Meritor*, 696 F.3d at 284. "[C]ourts tend to be skeptical of [exclusive dealing] claims because it is not in the long-term interest of the company that grants the 'exclusive deal' to drive out of business competitors of the grantee." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 66 (1st Cir. 2004). Courts generally require a showing of coercion, because "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought." *Barry Wright Corp.*, 724 F.2d at 236. Without a showing that one of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

parties was coerced into the arrangement, or that there was similar anticompetitive conduct, an exclusive dealing agreement may function simply as legal competition on the merits. *See PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-04689-WHO, 2014 WL 2987322, at *6 (N.D. Cal. July 2, 2014) ("PNY's assertion that SanDisk's agreements constitute exclusive dealing based on the fact that retailers have entered into and continually renew contracts with SanDisk is not plausible because PNY has not pleaded (beyond naked assertions) facts showing that it failed to win contracts despite offering better terms or that SanDisk somehow thwarted its efforts to secure business through conduct other than competition on the merits."). "That a manufacturer has a longstanding exclusive relationship with a retailer does not mean that their agreement constitutes actionable exclusive dealing." *Id.*; *see also id.* ("Absent allegations of predatory pricing or some other anticompetitive conduct, that is the essence of competition.").

Further, "the case law generally supports the contention that exclusive contracts of short duration that are readily terminable do not run afoul of the antitrust laws." *Pro Search Plus*, 2013 WL 3936394, at *2. "[T]he short duration and easy terminability of . . . agreements negate substantially their potential to foreclose competition." *Omega*, 127 F.3d at 1163 (footnote omitted). "If the contracts at issue are short-term or easily terminated, 'a competing manufacturer need only offer a better product or a better deal' to get contracts of its own." *PNY Techs.*, 2014 WL 2987322, at *4 (quoting *Omega*, 127 F.3d at 1164).

The FAC does not allege any terms in the agreements that serve to make them de facto exclusive. Similarly, the FAC does not allege any terms in the agreements that operate to make them coercive or ones that cannot be readily terminated. The FAC does not allege any conduct on the part of Etap that has compelled Schneider or OSI enter into these agreements. The allegations do not plausibly show that these agreements were made for a reason other than to advance the business interests of Schneider and OSI. There are no allegations that the agreements with Etap cannot be terminated if Plaintiff offers Schneider or OSI a more attractive arrangement. Therefore, the allegations are not sufficient to support the inference that Etap engaged in anticompetitive conduct. Further, the allegations as to the absence of a valid business reason for not partnering with Plaintiff are conclusory.

(b)     Antitrust Injury and Antitrust Standing

Antitrust injury requires "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). "The antitrust laws, however, were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 n.8 (1990) ("The antitrust injury requirement cannot be met by broad allegations of harm to the 'market' as an abstract entity. Although all antitrust violations, under both the per se rule and rule-of-reason analysis, 'distort' the market, not every loss stemming from a violation counts as antitrust injury."). To state an antitrust violation, the FAC must plausibly demonstrate that the Defendants' conduct caused harm to competition, not just to Plaintiff.

The FAC does not satisfy these standards. Although it could be construed to allege that Plaintiff will be injured if it cannot partner with OSI or Schneider, that alone is not enough to show harm to competition. *Cf. Atl. Richfield Co.*, 495 U.S. at 338 n.7 (rejecting that "antitrust injury requirement could be satisfied by a showing that the 'long-term' effect of the maximum-price agreements could be to eliminate retailers and ultimately to reduce competition"). "[R]emoval of one or a few competitors need not equate with injury to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

competition." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989); *see also id.* ("Plaintiffs insist that their allegation of market exclusion and resulting loss of income are sufficient to plead an outline of facts showing injury to competition that would enable a factfinder to conclude that defendants violated Sherman Act § 1. We cannot agree. Although proof of plaintiffs' allegations would establish harm to their business interests, such proof would not, standing alone, show injury to competition in the market as a whole."); *PNY Techs., Inc.*, 2014 WL 2987322, at *6 n.10 ("Any entity engaged in commerce will generally pick a better economic arrangement than a worse economic arrangement. The question is whether competition has been harmed, not just whether a competitor lost out on a deal.").

The FAC alleges that Plaintiff has been unable to partner with Schneider or OSI since the time they entered the challenged agreements with Etap. However, it does not allege that Schneider or OSI have not entered agreements with other third parties that offer products that compete with those of Plaintiff and Etap. Thus, the FAC only alleges that Plaintiff has been harmed by these agreements, not that others in the same market have been. *PNY Techs., Inc.*, 2014 WL 2987322, at *10 ("The crux of an exclusive-dealing case is the allegation that competitors are shut out of the market. It is not enough to point to supposed 'direct evidence of competitive harm' that cannot be attributed to the claimed exclusion."). Indeed, the FAC alleges that some others have been able to compete. FAC ¶ 72 ("Of the companies representing the rest of the market only one, Eaton, has a market share greater than 9%. Eaton, however, does not present a viable alternative EOEM for Power Analytics because Eaton offers products competitive to Power Analytics in this space."). The FAC does not adequately explain why Eaton is not a viable alternative. *Id.* ¶¶ 17, 23-25. The allegations with respect to Eaton suggest that other competitors have also been able to compete. Therefore, it its present form, the FAC alleges injury to Plaintiff as opposed to the market.

Defendants argue that because the FAC has not alleged antitrust injury, Plaintiff does not have antitrust standing. Thus, any antitrust harm from their alleged exclusive dealing agreements would be to the NUPIC or HR Data Center customers, not to Plaintiff, who is a competitor. Defendants argue that if their alleged agreements effectively prevented Plaintiffs from making sales to these customers, causing an increase in costs to them, only those customers would suffer antitrust injury. They argue that the competitor, even though it may have lost sales, does not have antitrust standing because "[i]t is not enough that the plaintiff's claimed injury flows from the unlawful conduct. An antitrust injury must flow from that which makes defendants' acts unlawful." *Am. Ad Mgmt.*, 190 F.3d at 1056 (internal quotation marks and alterations omitted). For example, "[c]ompetitors who challenge a rival's price-fixing are often unable to show injury." *Id.*; *see also id.* (competitors suffer antitrust injury and have antitrust standing when price-fixing is predatory). This is because "[w]hen prices are not predatory, any losses flowing from them cannot be said to stem from an anticompetitive aspect of the defendant's conduct. It is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." *Atl. Richfield Co.*, 495 U.S. at 340-41 (footnote and internal quotation marks omitted).

These principles apply to exclusive dealing claims. *Id.* at 340 ("We have adhered to this principle regardless of the type of antitrust claim involved."). A plaintiff-competitor has antitrust standing when the challenged, anticompetitive conduct targeted the plaintiff in an attempt to cause it to be removed from the market. *See, e.g.*, *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 457 (6th Cir. 2007) (en banc) (competitor does not have antitrust standing when challenging exclusive dealing, but, "[w]hat we have said here does not mean that a potential competitor may never bring an antitrust claim for exclusive dealing. Had the large retailers and [the defendant] conspired to eliminate [the plaintiff] from the market, that would be another matter. And should [the defendant] use these contracts and its current market dominance to establish

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|----------|--------------------------|------|--------------|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

unreasonable barriers to entry in the future, a potential competitor might have a legitimate antitrust claim."); *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 (3d Cir. 1999) (antitrust standing when surgeon with a private practice alleged that hospital-defendants conspired to eliminate him from the market by entering into exclusive dealing with other surgeons as well as engaging in various predatory acts such as circulating defamatory remarks about his patient care skills and revoking his courtesy privileges at one of the hospitals); *id.* ("In sum, we hold that Angelico has standing. This is not a case, however, in which we grant standing to a competitor who was simply harmed by strong competition. Rather, Angelico has asserted facts indicating that he was harmed by a conspiracy with an illegal anticompetitive intent."); *ZF Meritor, LLC*, 696 F.3d at 288 (antitrust standing where long-term exclusive dealing agreements where made not in response to customer demand but a preemptive step to block potential competition from the plaintiff's new joint venture).

\*          \*          \*

For the foregoing reasons, the FAC does not plausibly allege harm to competition as opposed to harm to a competitor. Therefore, it does not sufficiently state a claim for violation of Section 1 of the Sherman Act. Therefore, the Motions are **GRANTED** as to the Section 1 claim and it is **DISMISSED**, without prejudice.

b)      Sherman Act Section 2

The FAC alleges that Etap violated Section 2 of the Sherman Act for acts of monopolization and attempted monopolization. FAC ¶¶ 197-208. Section 2 applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. "There are three essential elements to a successful claim of Section 2 monopolization: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Allied Orthopedic Appliances*, 592 F.3d at 998 (internal quotation marks omitted).

The FAC alleges that Etap monopolized the NUPIC market and attempted to monopolize the HR Data Center Market. Etap contends that the Section 2 claims fail for the same reasons stated with respect to the Section 1 claim. Etap also contends that Plaintiff has not sufficiently alleged that Etap has monopoly power or has attempted to monopolize the relevant market.

For the same reasons discussed above in as to the Section 1 claim, Plaintiff has failed plausibly to allege a relevant market or anticompetitive conduct that caused antitrust injury. Therefore, the Section 2 claims fail for these same reasons. Further, the attempted monopolization claim fails because it is not adequately pleaded. Thus, it presents only the conclusory statement that Etap "has engaged in the predatory conduct described above with a specific intent to monopolize." FAC ¶ 204. This is not sufficient. *Aerotec Int'l*, 836 F.3d at 1184 ("intent is a necessary element of attempted monopolization"). Plaintiff must also adequately allege harm to competition. "The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publ'n, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985). Once again, the FAC does not meet these standards as to intent or harm to competition.

Plaintiff argues that the allegations as to Defendants' refusal to deal with Plaintiff are sufficient to show ill will towards Plaintiff and anticompetitive conduct. However, competitors may refuse to do business with their rivals. "Competitors are not required to engage in a lovefest; indeed, '[e]ven an act of pure malice by

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

one business competitor against another does not, without more, state a claim under the federal antitrust laws.'" *Aerotec Int'l*, 836 F.3d at 1184 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993)). Thus, to state an antitrust violation, a complaint must plausibly allege that defendants intended to monopolize and to harm competition, not just a competitor. *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988) ("Although the evidence supports the jury's finding of a predatory intent underlying Gasco's marketing campaign, the net result of this campaign seems to have been to increase competition in the market by inducing Oahu to lower its prices. Thus, we have before us a situation in which conduct with a predatory rationale had a procompetitive effect."). The FAC does not contain factual allegations that support an inference that Defendants intended to harm competition. Nor does it plausibly state a claim that Etap intended to monopolize the relevant markets..

The alleged conduct that supports Plaintiff's other tort and patent claims cannot form the basis of its Section 2 claims. Willful patent infringement does not violate the antitrust laws. *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. 1984) (Posner, J.) ("The theft of a perfectly valid patent, in contrast, creates no monopoly power; it merely shifts a lawful monopoly into different hands. This has no antitrust significance, although it hurts the lawful owner of the monopoly power."); *see also id.* at 267 ("It is not a purpose of antitrust law to confer patents or to resolve disputes between rival applicants for a patent."). Nor does tortious conduct. *Oahu Gas Serv.*, 838 F.2d at 370. This includes disparagement, as well as claims that a competitor induced a breach of contract, including by poaching employees. *See Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publications, Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997) ("While the disparagement of a rival or compromising a rival's employee may be unethical and even impair the opportunities of a rival, its harmful effects on competitors are ordinarily not significant enough to warrant recognition under § 2 of the Sherman Act."); *id.* at 1153 ("Absent a continued pattern of compromising American's employees, this one-time hiring of Jarvis by Harcourt is not sufficient to constitute an antitrust violation: Nor should the actual compromising of rival employees be grounds for § 2 liability in the absence of a continued pattern of such behavior or of reason to believe that the actual effect was probably significant." (internal quotation marks omitted)).

For the foregoing reasons, the FAC fails plausibly to allege a violation of Section 2 of the Sherman Act. Therefore, the Motions are **GRANTED** as to this claim and it is **DISMISSED**, without prejudice.

c)      Clayton Act Section 3

The FAC advances this claim against Etap based on the Grid Design and Real Time products. FAC ¶¶ 188-96. Section 3 provides in pertinent part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, . . . or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

Defendants argue that this claim must be dismissed because Section 3 applies only to tangible goods. The Grid Design and Real Time Products at issue are not such goods. "By its plain language, § 3 applies only to agreements for tangible goods or commodities." *Pro Search Plus*, 2013 WL 3936394, at *5; *see also Feitelson v. Google Inc.*, 80 F. Supp. 3d 1019, 1034 (N.D. Cal. 2015) ("the Court finds more persuasive the weight of opinion that 'commodity,' as that term is used in § 3 of the Clayton Act, refers to tangible goods."). The FAC defines the Grid Design and Real Time products as software programs. FAC ¶¶ 14, 15, 19, 24. Software is not a tangible good. *Feitelson*, 80 F. Supp. 3d at 1033-34.

For the foregoing reasons, the Etap Motion is **GRANTED** as to this claim and it is **DISMISSED**, with prejudice.

> 2.    Lanham Act Claim

The FAC advances a claim against Etap for false advertising in violation of the Lanham Act. FAC ¶¶ 215-19. 15 U.S.C. 1125(a) provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

The FAC alleges that:

> Etap has made false and misleading statements in advertisements about its own products, claiming, among other things, that it is the only NUPIC certified provider of certain Power Grid Design and Management Products for nuclear facilities and that its Power Grid Design and Management Products include "real time" functionality. This false claim of being the only eligible provider of Power Grid Design and Management Products for NUPIC facilities is one likely to influence purchasing decisions.

> These false and misleading advertisements have deceived consumers and induced them to decline to purchase Power Analytics Power Grid Design and Management Products and to procure Etap's products.

FAC ¶¶ 216-17.

These allegations are conclusory. The FAC also fails to allege actual deception or customer reliance on these statements. Plaintiff contends that it need not plead these elements, because the alleged

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

statements are literally false. Thus, it contends that it is also certified as an eligible provider of products for NUPIC facilities. Plaintiff also argues that Etap made false statements to certain customers that it could lawfully meet their design specifications, but that Etap could not do this without infringing Plaintiff's patents. These arguments are not persuasive.

*First*, the FAC contradicts Plaintiff's claim that Etap's statement about NUPIC certification is literally false. It alleges that, although some of Plaintiff's products are NUPIC-certified, others are not. Further, Etap offers more NUPIC-certified products than Plaintiff. FAC ¶ 40.

*Second*, whether the statements about Etap's ability lawfully to meet customer specifications are literally false necessarily turns on whether Etap infringed Plaintiff's patents. Plaintiff cannot bring a Lanham Act violation based on alleged patent infringement unless it can reasonably allege that Etap acted in bad faith. *See Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1352-53 (Fed. Cir. 1999) ("Though the differences between the Lanham Act and the patent laws may not appear as sharp as those between the patent and antitrust laws, there is a tension. We have on several occasions recognized that a patentee's statements regarding its patent rights are conditionally privileged under the patent laws, so that such statements are not actionable unless made in bad faith."); *Applera Corp. v. Michigan Diagnostics, LLC*, 594 F. Supp. 2d 150, 161 (D. Mass. 2009) ("However, a claim for patent infringement, without more, cannot be the basis for an unfair competition claim under Section 43(a) of the Lanham Act.").

The FAC does not contain factual allegations plausibly asserting that Etap acted in bad faith. *See Applera Corp.*, 594 F. Supp. 2d at 162 ("Pleading knowledge of non-infringement or invalidity in broad conclusory terms without specifics would enable an accused infringer to add a Lanham Act claim to almost every case. To forestall that eventuality, *Zenith* requires an allegation of bad faith. *Twombly* requires this allegation to include 'enough facts to state a claim to relief that is plausible on its face,' such that the claim crosses 'the line from conceivable to plausible.'" (citation omitted) (quoting *Twombly*, 127 S. Ct. at 1974)).

For the foregoing reasons, the Motion is **GRANTED** as to the Lanham Act claim and it is **DISMISSED**, without prejudice.

### 3.   State Law Claims

#### a)   Inducement of Breach of Contract and Trade Theft

Etap argues that this claim must be dismissed because it is a trade secrets claim, and the FAC does not allege any protectable trade secrets. Plaintiff disagrees that this is a substantive trade secrets claim. Plaintiff has cited no authority that such a claim exists under North Carolina law or that a trade theft claim is distinct from a trade secrets claim. Accordingly, the Motion is **GRANTED** as to this claim and it is **DISMISSED**, without prejudice.

#### b)   Tortious Interference with Contract Claim

In North Carolina, a tortious interference with contract claim requires proof of the following:

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 584, 561 S.E.2d 276, 285 (2002) (citation omitted).

The FAC alleges that Plaintiff had agreements with two of its employees "which specifically precluded them from disclosing Power Analytics Confidential business information obtained by them during the course of their employment by Power Analytics to any third party." FAC ¶ 231. It also alleges that Etap was aware of these contractual restrictions when it hired both employees, but then took actions that caused these employees to breach their obligations to Plaintiff. *Id.* ¶ 232. The FAC alleges that these actions were intentional and damaged Plaintiff by giving Etap access to its confidential information. *Id.* ¶ 233.

Etap argues that this claim should be dismissed because it relies on Etap's alleged misappropriation of Plaintiff's confidential business information through these employees, but does not reveal with particularity what confidential business information or trade secrets are at issue. Plaintiff is required to plead with particularity the nature of the confidential business information that is at the heart of this claim. *See VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510, 606 S.E.2d 359, 363-64 (2004) (dismissing claims, including those for tortious interference with contract, breach of non-disclosure agreement and misappropriation of trade secrets, in suit by employer against competitor that hired former employee for failing to plead the trade secrets with particularity).

The conclusory allegations here are insufficient. For the foregoing reasons, the Motion is **GRANTED** as to this claim and it is **DISMISSED**, without prejudice.

c)     Tortious Interference with Prospective Economic Advantage Claim

"In order to maintain an action for tortious interference with prospective advantage, Plaintiff must show that Defendants induced a third party to refrain from entering into a contract with Plaintiff without justification. Additionally, Plaintiff must show that the contract would have ensued but for Defendants' interference." *DaimlerChrysler Corp.*, 148 N.C. App. at 585 (citation omitted).

Defendants argue that this claim should be dismissed because Plaintiff does not identify any particular contract that was not entered. *Id.* Plaintiff responds that it does not have to make such a showing to support this claim. It cites Delaware law to support this position. This claim alleges that Plaintiff seeks damages under North Carolina law. FAC ¶ 237. Plaintiff does not identify any particular contract as required by North Carolina law.

For the foregoing reasons, the Motion is **GRANTED** as to this claim and it is **DISMISSED**, without prejudice.

d)     Conspiracy Claim

The FAC does not plausibly allege a claim for civil conspiracy. The supporting allegations are conclusory, and state the legal elements of civil conspiracy. *See* FAC ¶¶ 238-43. Further, the claim appears to be premised on others in the FAC that seek to allege illegal conduct by Defendants. Because the FAC does not plausibly allege the antitrust or state tort claims, these claims cannot provide the basis for the conspiracy claim. For the foregoing reasons, the Motion is **GRANTED** as to the this claim and it is **DISMISSED**, without prejudice.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |


e)      North Carolina UDTPA Claim

Plaintiff brings a claim for violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen Stat. § 75-1.1. In support of this claim, the FAC alleges that it is premised on

> Defendants' (1) infringement of Power Analytics' patents; (2) false statements made to customers and in the bidding of contracts; (3) business and product disparagement; (4) false statements and advertising; (4) inducement of the breach of employee confidentiality agreements and theft of trade secrets; and (5) agreements in restraint of trade and to foreclose or exclude competition.

FAC ¶ 222.

"In order to state a claim under the UDTPA, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. Whether conduct is "unfair" or "deceptive" is a legal issue for the court to decide." *Ellis v. Louisiana-Pac. Corp.*, 699 F.3d 778, 787 (4th Cir. 2012) (citation and internal quotation marks omitted).

Defendants argue that none of the five alleged bases in the FAC can support the UDTPA claim. Defendants argue that the UDTPA claim is preempted by the federal patent laws, as it does not require the proof of an element beyond that required to show patent infringement. *Knova Software, Inc. v. Inquira, Inc.*, No. CIV.A.06 381 JJF, 2007 WL 1232186, at *3 (D. Del. Apr. 27, 2007); *see also Zenith*, 182 F.3d at 1355 ("to avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim."). The reliance in the UDTPA claim on the common law tort claims or antitrust claims is insufficient because as explained above, those claims are not adequately pleaded. Similarly, Plaintiff cannot rely on its allegations concerning breach of contract because "breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain a UDTPA claim." *Ellis*, 699 F.3d at 787 (internal quotation marks omitted).

Because no viable claims have been alleged that can form the basis for the UDTPA claim, the Motions are **GRANTED** as to this claim and it is **DISMISSED**, without prejudice.

\\

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | SA CV16-01955 JAK (FFMx) | Date | May 10, 2017 |
|---|---|---|---|
| Title | Power Analytics Corporation v. Operation Technology, Inc., et al. | | |

## IV.    Conclusion

For the reasons stated in this Order, the Motions are **GRANTED**. The Clayton Act Section 3 claim is **DISMISSED**, with prejudice. The other non-patent claims in the FAC are **DISMISSED**, without prejudice.

Because the status conference with respect to discovery and settlement was not held, the Court directs counsel to meet and confer and file a joint report within 10 days of the issuance of this Order. The report shall include: (i) the status of discovery and whether the parties anticipate any amendments to the discovery deadlines set forth in the December 1, 2016 Scheduling Order (Dkt. 147); and (ii) whether a mediation session would be productive and, if so, the agreed upon settlement method and anticipated date of its completion.

**IT IS SO ORDERED.**

_____ : _____

Initials of Preparer    ak