Don F. Livornese (SBN 125,934)
donl@ruyakcherian.com
RUYAKCHERIAN LLP
222 N. Sepulveda Blvd, Suite 2000
El Segundo, California 90245
Telephone: (310) 586-7689

[Additional counsel on signature page]

Attorneys for Plaintiff
*Power Analytics Corporation*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| POWER ANALYTICS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>OPERATION TECHNOLOGY, INC. d/b/a ETAP; OSISOFT, LLC; and SCHNEIDER ELECTRIC USA, INC.,<br><br>Defendants. | Case No. 8:16-CV-1955-JAK-FFM<br><br><br>**CORRECTED THIRD AMENDED COMPLAINT – NON-PATENT CLAIMS ONLY**[1]<br><br>Discovery Cutoff: March 12, 2018<br>Pre-Trial Conf.: November 19, 2018<br>Trial Date: December 4, 2018 |

---

[1] On December 21, 2017, this Court entered partial judgment under Fed. R. Civ. P. 54(b). Power Analytics intends to appeal this Order. Should the Federal Circuit reverse this Court's Order, Power Analytics fully intends to pursue its patent infringement claims.

### THIRD AMENDED COMPLAINT

Plaintiff, Power Analytics Corporation ("Power Analytics") brings this action under federal antitrust laws, the North Carolina State Unfair and Deceptive Trade Practices Act, the Cartwright Act, the California Unfair Competition law, and common law, and alleges, upon its own knowledge, and on information and belief as to all other matters, as follows:

### THE PARTIES

1.     Power Analytics is a Delaware corporation, with its principal place of business and headquarters at 9208 Falls of Neuse Road, Suite 215, Raleigh, NC, 27615. Power Analytics is in the business of developing, selling and supporting software products which are used in the operation of electric power distribution systems ("Power Grids"). Power Analytics' line of products are employed in Power Grid design; control and safety management; the collection, storage and analysis of system data; and the modeling, simulation and visualization of grid operations. The company makes its own products and sells them together with related services to customers located throughout the United States and in foreign locations.

2.     Defendant Operation Technology, Inc. d/b/a ETAP ("ETAP") is a California corporation, with its principal place of business at 17 Goodyear, Suite 100, Irvine, CA 92618.

3.     ETAP develops and sells software products for use with Power Grids, many of which are similar in functionality to those developed and sold by Power Analytics.

4.      OSIsoft, LLC ("OSI") is a Delaware Limited Liability Corporation, with its principal place of business at 777 Davis Street, San Leandro, California 94577.

5.      OSI, among other things, develops and sells Power Grid data collection and archiving software products for use with Power Grids. OSI sells these products and related services to customers located throughout North America.

6.      Schneider Electric USA, Inc. ("Schneider") is a Delaware corporation with its principal place of business in Andover, Massachusetts. Schneider is a wholly owned subsidiary of Schneider Electric SE.

7.      In 1991, Schneider Electric SE acquired Square D following a tender offer that empowered Schneider Electric SE to oust Square D's Board.  The acquisition made Schneider Electric SE the world's largest maker of electrical distribution equipment. Schneider's business includes a vast variety of electric automation and control products, as well as services in the Critical Power, Electrical Distribution, Industrial Automation, Power Management, Integrated Facility Management, Facility Operations, Vendor Management and Managed Maintenance areas.

8.      Among other things, Schneider makes and sells software products and a multitude of devices for use with Power Grids. Schneider sells these products and related services to customers together with products and services provided by other suppliers as a bundled or "Platform" product to customers throughout North America.

-2-

**JURISDICTION AND VENUE**

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367; 15 U.S.C. §§ 15, 26 and 1125.

10.     This Court has personal jurisdiction over each Defendant and venue is proper in the Central District of California under 28 U.S.C. § 1391 and 15 U.S.C. § 22. Each Defendant resides and/or has a regular and established place of business in this District. Each Defendant transacts business in this District and has substantial contacts in this District. Each Defendant has consented to this Court's personal jurisdiction.

11.     ETAP is incorporated in California and has its headquarters in Irvine, California. ETAP consented to this Court's personal jurisdiction through the filing of a motion to transfer to this District. Therefore, the exercise of personal jurisdiction over ETAP by this Court is authorized under 15 U.S.C. §§ 15, 22; and the exercise of personal jurisdiction over Etap would not offend traditional notions of fair play and substantial justice.

12.     OSI has its headquarters in San Leandro, California; and some of OSI's employees, such as sales representatives, work remotely from Los Angeles, Orange County. OSI consented to this Court's personal jurisdiction through the filing of a motion to transfer to this District. The exercise of personal jurisdiction over OSI by this Court is authorized under 15 U.S.C. §§ 15, 22; and the exercise of personal jurisdiction over OSI would not offend traditional notions of fair play and substantial justice.

-3-

13.     Schneider has at least ten offices in California and transacts business in this District. Schneider offers for sale and/or sells Schneider Accused Products in this District.  Schneider consented to this Court's personal jurisdiction through the filing of a statement of non-opposition to other Defendants' motion to transfer to this District and subsequent filings.   Therefore, the exercise of personal jurisdiction over Schneider Electric USA, Inc. by this Court is authorized under 15 U.S.C. §§ 15, 22; and the exercise of personal jurisdiction over Schneider would not offend traditional notions of fair play and substantial justice.

## POWER ANALYTICS' ALLEGATIONS AGAINST DEFENDANTS

A.     **General Background - The Products and Services at Issue**
       **Power Grids and Microgrids**

14.     Power Grids are networks that move and distribute electric power between generators and other sources for electricity consuming devices.

15.     Microgrids are small-scale Power Grids used for safe and reliable movement and distribution of electrical power in specific physical facilities, applications or defined geographic areas. Microgrids may operate in isolation in a controlled, coordinated fashion connected to other Microgrids, or connected to a larger Power Grid.

16.     Microgrids are often employed in power generation facilities, (like nuclear power plants), data centers and other commercial and industrial facilities that consume large volumes of electric power.

-4-

17.     Microgrids are comprised of Grid Elements, i.e., devices and operational components physically connected to the Grid.

**Grid Design and Management Products and Services**

18.     Grid Design and Management Products and Services, ("Grid D and M Products and Services") consist of software and hardware used in the design of, and the safe, stable and efficient operation and management of, the Microgrids, that operate in facilities such as nuclear power plants, oil refineries, commercial and industrial buildings, data centers, military installations, and air traffic control centers.

19.     Grid D and M Products are a critical and necessary infrastructure component for Power Grids and Microgrids.  There are multiple, distinct products and services within the Grid D and M Products and Services category, three of which are relevant to Power Analytics' claims here.

20.     These are: (i) Grid Design Products and Services ("Grid Design"), (ii) Real Time Products, and (iii) Historian Software Products.

**Grid Design Products and Services**

21.     The first relevant product type is Grid Design Products and Services.

22.     Grid Design Products are software programs used in the engineering, design and subsequent management of Power Grids and provide a functionality unique for use in Power Grids.

-5-

23.     Power Analytics makes and sells Grid Design products, which include DesignBase™ and DesignBase Xi™.

24.     Etap makes and sells Grid Design products that compete with Power Analytics' products, such as ETAP® Enterprise Solution ("ETAP®"), also described in http://etap.com/Documents/Download%20PDF/etap-product-overview-HQ-2015.pdf and Integrated Smart Grid Solution ("Etap Grid"), also described in http://etap.com/Documents/Download%20PDF/etapGrid-2016-HQ.pdf (collectively, "ETAP Grid Design Platforms").

25.     Certain Grid Design Products and Services offered and sold by Power Analytics and ETAP are distinguished by having been audited and certified for use in nuclear facilities, as required by federal law and or regulation governing operation of such facilities.

**Real Time Products**

26.     The second product classification within the Grid D and M category are Real Time products.

27.     Real Time products are software products that provide for additional functionality once the Power Grid is installed and deployed. Such functionality may include the monitoring, modeling, simulation, and visualization, the current and future operation of the Power Grid by collecting and utilizing current data in near real time to inform such functionality. In addition, Real Time Products may function to evaluate and

-6-

track system failures and avoid future damaging events by analyzing trends and predicting potentially damaging events such are Arc Flash. Real Time Products can be used to enable Power Grids to run securely, safely, efficiently and without significant interruption.

28.     Real Time Products include software applications with functionality that is unique for use in power grids.

29.     Power Analytics makes and sells Real Time Products called Paladin® Gateway™ and Paladin® Live™.

30.     One significant and dangerous Power Grid event is known as "Arc Flash" (or "Arc Heat" or "Arc Blast"). Arc Flash occurs when high current electrical equipment attached to the Power grid fails or is faulted inadvertently. An Arc Flash event is characterized by a blast of light flash and radiant heat that can reach 35,000 degrees Fahrenheit. This amount of heat absorbed by nearby objects and personnel can result in intense burns, destruction and death. According to OSHA, there are 30,000 arc flash events per annum, leading to 7,000 burn injuries per year, with more than 2,000 victims admitted to burn centers with severe arc flash injuries.

31.     Among its Real Time Products, Power Analytics makes and sells an Arc Flash real–time monitoring, simulation and visualization software to track Power Grid operations on a continuous basis and predict potential Arc Flash hazards in advance of

-7-

their occurrence ("Real Time Arc Flash"), together with its other Real Time Products and Grid Design Products.

32.     Defendants ETAP and Schneider compete against Power Analytics' Real Time Products by offering and selling products, including but not limited to Model-Driven Real-Time™ Solution ("ETAP Real-Time"), also described in http://etap.com/Documents/Download%20PDF/Real-Time-Overview-2015-HQ.pdf, that purport to provide such functionality.

**Historian Software**

33.     Certain facilities, predominantly nuclear power generation facilities, are required by law or regulation to systematically collect and retain time series information related to the operation of the facilities' Power Grid system, to store such information for extended periods of time as "records" of system performance, and report certain prescribed incidents of system operation to other nuclear facilities using Grid D and M products.  The software products that perform this essential information management function are known in the industry as "Historian Software Products."

34.     Grid Design Products and Real Time Products, if audited and implemented in nuclear facilities, must interact with Historian Software, in order to meet legal and regulatory requirements.

35.     Power Analytics' Paladin Gateway Grid Design product, for example, interacts with Power Analytics" Historian Software, "Antidote," which collects data

-8-

from various Grid Elements and portions of the Power Grid, provides such data to Paladin Gateway and stores the information in a time series database. The Historian software may be sold separately or together with Grid Design and Real Time Products. Power Analytics and all three defendants each offer separately an Historian Software Product.

36.    OSI offers a Historian Software product called PI Systems.

37.    Schneider offers a Historian Software called "Vijeo Historian," the information management component of Schneider's StruxureWare™ software.

38.    Etap offers a Historian Software called ETAP Real-Time Playback Historian.  Etap advertises and states publicly that both its Grid Design and Real Time Products seamlessly interface with the Historian Software products of both OSI and Schneider.

**EMS Platforms**

39.    In addition to the products discussed above, combinations of components or "bundles" of products and services, including Grid Design Products and Real Time Products, are sold to facility owners and managers as a complete "platform" or "bundled" product utilized to operate the entire Microgrid ("EMS Platforms").

40.    EMS Platforms are a bundle of integrated components, specifically marketed and sold as a complete bundle, that optimize, supervise and control power, providing a turnkey system to run the entire Power Grid.

-9-

**DEFENDANTS' CONDUCT VIOLATING THE ANTITRUST LAWS**

A.  **The Governing Legal Precepts**

1.  **Relevant Antitrust Markets**

41.  Under prevailing federal antitrust law, as applied in this and other jurisdictions, market definition can "be determined only after a factual inquiry into the 'commercial realities' faced by consumers.'".[2]

42.  Courts in this and other jurisdictions commonly use the SSNIP test to determine what products should be included in the relevant market. The SSNIP test asks what customers would do in the event of a small but significant non-transitory increase in price (SSNIP).

43.  Under federal antitrust law, "it is legally permissible to premise antitrust allegations on a submarket. That is, an antitrust claim may, under certain circumstances, allege restraints of trade within or monopolization of a small part of the general market of substitutable products."[3]

44.  In *Brown Shoe*, the United States Supreme Court stated that within broad product markets "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593-595.The boundaries of such a submarket may be determined by

---

[2] *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) (*citing Eastman Kodak Co. v. Image Tech. Servs.*, 504 US 451, 482 (1992) (*citing United States v. Grinnell Corp.*, 384 US 563, 572 (1966)).
[3] *Newcal Indus. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008).

-10-

examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."[4]

45.     To determine what products are to be included within a relevant antitrust market, one must look to customer demand.

46.     "In considering what is the relevant market for determining the control of price and competition, *no more definite rule can be declared than that commodities reasonably interchangeable by consumers* for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal."[5]

47.     Under the federal antitrust laws, relevant product markets distinct from the general market for a product have been recognized based on the fact that certain forms of supply can serve those "classes of customers the other channels cannot reach."[6]

48.     Under the federal antitrust laws, a relevant product market can be determined by looking at government regulations as to what sorts of products can be used in a specific project.

49.     In *McWane, Inc. v. FTC*, the Court upheld the FTC's proposed product market "for the supply of domestically manufactured fittings for use in…projects with

---

[4] *Brown Shoe Co. v. United States*, 370 US 294, 325 (1962).
[5] *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (emphasis added).
[6] *FTC v. Sysco Corp.*, 113 F. Supp.3d 1, 29-30 (D. D.C. 2015).

-11-

domestic only specifications."[7] The Court upheld this definition, even though Defendants argued that "domestic and imported fittings are, in fact, interchangeable".[8]

50.     The Court found that "various laws and end-user preferences requiring projects to use domestic fittings precluded imported fittings from being 'reasonable substitutes' for those projects, even though the fitting themselves are functionally identical."[9]

51.     There is no requirement under the antitrust laws that a Plaintiff allege that it has been foreclosed from all conceivable sales opportunities. All that is required is for Plaintiff to allege "substantial foreclosure". The Ninth Circuit has found that a finding of foreclosure as low as 24 percent is sufficient to show substantial foreclosure.[10]

2.     **Agreement**

52.     An anticompetitive Agreement under the antitrust laws is an arrangement between two or more market participants that reflects "a unity of purpose or a common design and understanding" which unreasonably restrains trade and/or has an adverse effect on competition.

---

[7] *McWane, Inc. v. FTC*, 783 F.3d 814, 828-829 (11th Cir. 2008).
[8] *Id.* at 829.
[9] *Id.* (citing IIB Phillip E. Areda, Herbert Hovenkamp & John Solow, Antitrust Law ¶ 572b, at 430 (3d ed.  2007) ("To the extent that regulation limits substitution, it may define the extent of the market.").
[10] *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982).

-12-

### 3.   Unreasonable Restraint of Trade

53.   Whether the parties to the agreement believe that such arrangement is commercially reasonable is not the relevant inquiry.  The Agreement must satisfy an objective standard of whether it unreasonably restrains trade.

54.   Unreasonable restraints of trade include agreements that limit choices, output or price competition, as well as those that create, maintain, or enhance market power on a basis other than competition on the merits.

55.   Proof of anticompetitive intent is not necessary for an agreement to unreasonably restrain trade.

### 4.   Antitrust Standing

56.   Under the federal antitrust laws, actual or potential market participants who have been foreclosed and/or excluded from a substantial part of the relevant market have antitrust standing.

## Coercion is Not a Required Element of an Antitrust Claim

57.   The law of this circuit and others is that coercion is not a necessary element of stating a claim of an agreement in restraint of trade based on exclusive dealing between the defendants. This is explicitly supported by *PNY Technologies,* which states the following in footnote 8:

> SanDisk also disputes PNY's allegations that SanDisk has coerced retailers
>
> into exclusive dealing arrangements, saying that PNY fails to plead any
>
> facts to supports its allegations. Mot. 8. ***PNY rightly points out that***

-13-

***coercion is not a necessary element of the claim,*** Opp'n 12 n.7, and SanDisk does not meaningfully respond.[11]

58.     This law was recently followed in the Central District of California's rejection of Defendants' motion for summary judgment in *Complete Entertainment*.[12]

**The Anticompetitive Agreement between ETAP and OSI Which has Foreclosed Competition in the NUPIC Grid Design and NUPIC Real Time Markets**

**I.      The Relevant Antitrust Markets**

59.     There are two relevant antitrust product markets for products and services unreasonably restrained by ETAP and OSI.

60.     The first market is for the sale and servicing of Grid Design Products to customers who, by law and or regulation, may only purchase and deploy Grid Design Products that have been "certified" by successfully completing a NUPIC audit within the prior three years (the "NUPIC Grid Design Market").

61.      The second relevant product market is the sale and servicing of Real Time Products to customers who, by law and or regulation, may only purchase and deploy Real Time Products that have "certified" by successfully completing a NUPIC audit within the past three years (the "NUPIC Real Time Market").

62.     The customers in these two markets are composed almost entirely of nuclear power generation facilities, a small number of other facilities that use or employy

---

[11] *PNY Techs., Inc. v. SanDisk Corp.,* 2014 WL 2987322, n. 8 (N.D. Cal. July 2, 2014) (emphasis added).

[12] *Complete Entm't Res., LLC v. Live Nation Entm't, Inc.*, No. CV 15-9814, 2017 U.S. Dist. LEXIS 183213, * 7 – 8 (C.D. Cal. Oct. 26, 2017).

-14-

nuclear power, and entities who provide design and other services to such nuclear power facilities.

63.     NUPIC stands for the Nuclear Procurement Issues Committee, an industry partnership among nuclear power plants licensed by the Nuclear Regulatory Commission (NRC). All North American nuclear facilities are members of NUPIC. Nuclear power plants are required to perform audits pursuant to 10 C.F.R. 50 – Appendix B before using certain products in their facilities.  NUPIC "certification" requires that such products are subjected to audits by at least five separate NUPIC members.   Once the required number of NUPIC members are satisfied with the audit results, one utility is selected to conduct an audit every three years.

64.     This NUPIC audit process makes products and services sold in the NUPIC Grid Design and NUPIC Real Time Markets economically and functionally distinct from other markets that may involve the sale and servicing of non-NUPIC certified Grid Design and Real Time Products, such as the EMS Platform Market described herein, in several ways.   First, non-certified products cannot, by law and or regulation, be substituted for NUPIC certified products and services, and therefore are not reasonable substitutes.   In fact, there are no reasonable substitutes for NUPIC Grid Design and NUPIC Real Time Products.  Therefore, they each factually comprise relevant antitrust markets under prevailing law.  Second, NUPIC certified products and services must be manufactured and must perform to meet specific safety and reliability standards, must

-15-

maintain specifically mandated historical and ongoing performance documentation and records, employ and retain specifically trained and approved sales, support and quality assurance personnel on staff, and are subjected to repeated audits, all of which are necessary to maintain certification; none of which is required for the sales of non-NUPIC certified products and services.  Non-certified products and services that do not incorporate and meet these mandatory requirements are not reasonable substitutes for NUPIC certified products and services.  For this reason, they factually comprise relevant product markets under prevailing law. In addition, NUPIC certified products and services require additional operational components including a Quality Assurance Plan and Software Development Standards for each customer and impose specific reporting requirements that all NUPIC customers must be individually notified in the event of a Grid System fault or potential safety incident at any one customer site. Non-NUPIC certified products have not such requirements, and therefore are not reasonable substitutes for NUPIC-certified products and services.  This combination of required software, services, and components are together defined as "NUPIC Grid Design and Management" and "NUPIC Real Time Products."

65.    These significant added features and recurring service requirements represent a substantially different and higher cost structure and product offering making NUPIC-certified products a distinct relevant product market under the antitrust laws.

**The Market Participants**

-16-

66.     There are, and have been at all times relevant to the claims here, only two competitors with audited "certified" products in the NUPIC Grid Design Market. These are Defendant ETAP and Plaintiff Power Analytics.

67.     ETAP has successfully completed at least three NUPIC audits for its Grid Design Product since 2010. ETAP is currently eligible to sell its Grid Design Products to NUPIC customers. ETAP has also publicly stated – falsely – that it has the only Grid Design Product certified by NUPIC.

68.     Power Analytics' Design Base™ product for use in the design of Power Grids has successfully passed multiple NUPIC audits since 2010. Power Analytics has historically participated in the NUPIC Grid Design Market, Design Base™ product. Power Analytics' Design Base™ is lower priced than ETAP's competing product and offers additional functionality attractive to NUPIC market customers, such as direct current system design management. Power Analytics is currently eligible to sell its Grid Design Product to NUPIC customers.

69.     ETAP's and PA's NUPIC Grid Design products and services must be used by Nuclear facility customers in conjunction with Historian Software to meet record keeping requirements.  Historian software itself need not be audited and certified since it does not actively manage the electric grid.

70.     The limited number of competitors currently selling NUPIC Grid Design products in the market is a direct result of the following factors: the self-admitted market

-17-

dominance of ETAP for NUPIC certified Grid Design products and the self-admitted market dominance of OSI in Historian Software in the NUPIC market; the high barriers to entry for additional competitors alleged in factual detail herein; and the illegal anticompetitive agreement set forth in detail below between ETAP and OSI to foreclose all others from the NUPIC market.

### The Relevant Geographic Market

71.    The relevant geographic market for both NUPIC Markets is North America. The provision of software and services to NUPIC members, all of which are located in North America, requires dedicated personnel in close proximity to the facilities in order to provide service and maintenance.

### ETAP and OSI's Admitted Market Power and Dominance

72.    The NUPIC market is a low growth market in terms of new customers and new sites for existing customers. Only a single reactor has opened within the last twenty years.

73.    As this market is predominantly made up of already existing reactors, the majority of customers already deploy NUPIC-certified power grid design and management products. As a result, the competition within this market is directed in substantial part to the replacement and/or upgrading of existing products and services having lower cost, technological superiority and new functionality, particularly in the areas of safety and reliability, and more efficient, operating cost reducing services.

-18-

74.     ETAP has market power and dominance in the NUPIC Grid Design Market. ETAP has admitted publicly that its NUPIC Grid Design Product has a 97% market share among NUPIC facilities in the North American geographic market, with at least 60 of 64 U.S. nuclear power facilities as customers. ETAP also has 5 of the 6 Canadian nuclear power facilities and all 3 of the nuclear power facilities in Mexico.

75.     OSI has market power, with an admitted, dominant monopoly share of Historian Software in the NUPIC market.  According to OSI, 100% of all operating nuclear power generators in Canada and 76% of operating nuclear power generators in the U.S. use OSI products.

**Barriers to Entry of Competing Grid Design and Real Time Products in the NUPIC Market**

76.     The barriers to entry for competitors wishing to offer for sale products and services in the NUPIC Grid Design and Real-Time markets are substantial. The markets are characterized by relatively few customers. The NUPIC audit, certification, product functionality, related personnel and record keeping, reporting, re-auditing, Quality Assurance and Software Development standards all impose significant additional financial and operational burdens on any potential competitor intending to enter the market to sell NUPIC-certified products. These attributes and requirements substantially increase the costs of participation, and impose multiple years of investment and startup time to entry.

-19-

77.     In addition to Power Analytics as an existing competitor, there are a significant number of potential competitors identified by ETAP in its own corporate documents including SKM, DigSilent, Cyme (Eaton) and PSSE who manufacture non-NUPIC-certified Grid D and M products. Yet, none of these companies as a matter of fact, have entered the NUPIC market, despite ETAP's fear that they might do so.  None of these recognized rivals have completed a NUPIC audit for their respective Grid Design Products nor satisfied the other NUPIC requirements.

78.     ETAP's extraordinary monopoly position and market dominance covering 97% of all nuclear facilities limits the potential contestable market available for new entrants to recoup the substantial costs associated with market participation to just 3%.

2.    **The ETAP OSI Agreement**

79.     The anticompetitive Agreement alleged here between ETAP and OSI is not a vertical agreement between a buyer and seller, or a manufacturer and a retailer, but instead an agreement between two sellers of independent, but necessarily interconnected products to foreclose and exclude existing and potential competitors from providing products which challenge each of their dominant monopoly positions in the market.

80.     OSI And ETAP agreed, at least as early as 2013, to maintain and enhance their individual and collective monopoly positions in the NUPIC Market by and through an exclusive arrangement whereby they would sell their products in conjunction with

-20-

each other in order to foreclose competitors from challenging their market power and to maintain and increase their monopoly positions.

81.   This maintenance of each parties' monopoly position is not competition on the merits, such as offering a lower price, higher quality, or technologically advanced product. Instead, this agreement is a partnership between two entrenched monopoly shareholders that is designed to protect each from competition by others, actual or potential, who offer the same or similar products.

82.   Because OSI is the entrenched, dominant incumbent that makes the Historian software, no customer is willing to switch out the software made by OSI's its "strategic partner" ETAP, for that of an ETAP competitor such as Power Analytics.

83.   This agreement also protects OSI, as it links OSI to the entrenched, monopoly shareholder in NUPIC Grid Design, ETAP. Since ETAP has partnered with OSI and its Historian product, the 97% of end users with ETAP Grid Design are unwilling to switch their Historian software to a company that is not a "strategic partner" to entrenched monopolist ETAP.

84.   The intent of their Agreement is admitted in ETAP and OSI's own corporate records. In November 2013, Plaintiff Power Analytics, formerly known as EDSA, issued a Press Release announcing its patented Real Time Product. The press release stated that "when connected with our Paladin Live solution, you get the ability to see the 'as designed' system and compare it against the real time power system as it

-21-

is operating. You can run what-if scenarios, generate reports, view real time usage and

diagnostic data."

85.     ETAP learned of the press release and immediately recognized that Power

Analytics posed a competitive threat. Hossain Shaikh of ETAP emailed Etap colleagues

and stated as follows:

> "Great!!!!!
>
> All of our USP [Unique Sales Proposition] will be now for EDSA. We need to
> kill such competition from these companies. (EDSA, Cyme, DigSilent, PSSE in
> particular)."

86.     Similarly, in September 2014, ETAP and OSI announced an agreement

which they characterized as a "strategic partnership," but was intended and operated,

according to their own business records to further OSI's express business strategy to

find "partners" that will help it "lock out competition."  This OSI business strategy was

described in OSI's "Global Channel Partner Strategy" presentation and in multiple other

documents.

87.     The ETAP OSI Agreement was not a "typical OEM Agreement", but was,

as admitted in their own words, designed and intended to extend well beyond typical

OEM agreements.

88.     In an email to OSI dated March 2014, ETAP states:

> Thanks for the discussion with you and Norma on Friday, and
> reviewing ETAP's concerns about the OEM agreement that you'd

-22-

sent earlier. The fact is, simply, ***ETAP isn't going to be an OEM in
the traditional sense***, and many of the terms and conditions
contained in OSIsoft's OEM agreement simply don't apply in this
case.

89.    Given the dynamics of this market, competitors could only challenge
ETAP's and OSI's dominant monopoly positions by unseating them from existing
customers by competing on the basis of such competitive benchmarks as lower prices,
more innovative products and superior service.  Competitors to ETAP's Grid D and M
products must have access to and the ability to interact with Historian software of other
providers or provide their own Historian software.  Competitors of OSI's Historian
software need to have access to and interact with NUPIC certified Grid D and M
products or provide their own NUPIC certified Grid D and M products.

90.    To exclude competition from existing and potential competitors which
would challenge their market shares, erode their prices and force them to upgrade and/or
introduce new products, ETAP and OSI agreed to sell their products in conjunction with
each other.   Any customer wishing to use other combinations of products from
competitors would face significant price penalties in the form of substantial and
duplicative licensing fees and/or data conversion fees.

91.    In line with that objective, the ETAP OSI Agreement included
unreasonable impediments and conditions intended to preclude and/or deter NUPIC
Market customers from choosing to swap out OSI and ETAP's products for those of a

-23-

number of actual and potential competitors, including Power Analytics' Historian, Grid Design and Real Time Products, as well as Historian Software Products offered by, among others Honeywell and Aspen Tech, with whose products, ETAP publicly claims it has achieved integration.

92.     A Term Sheet, circa 2013, documenting key provisions of the ETAP-OSI Agreement required the inclusion of specific wording in ETAP's Standard License Agreement providing that OSI products that a customer purchased under the ETAP/OSI arrangement could be used by the customer solely in conjunction with the ETAP products.

93.     Any customer that wished to switch to a competitor's Grid D and M Products, having already made one payment for the use of OSI's Historian software, would suffer the unreasonably imposed penalty of shouldering the additional cost of another duplicative license to the same OSI Historian Software or face the enormous costs associated with the replacement of OSI's Historian software and the massive data conversion costs associated with such a conversion.

94.     Further, the parties' Memorandum of Understanding obligates OSI to exclusively "recommend and promote ETAP Products as a preferred power systems analysis and management platform" to all prospective customers and includes a reciprocal requirement for ETAP to do the same.

-24-

95.    ETAP and OSI each have powerful incentives binding them to this anticompetitive exclusivity mechanism. Allowing competitive products and competitors into their monopolized customer base by opening the market to alternative, lower cost and more innovative products having greater functionality, would challenge their high prices and profits, and risk the loss of customers seeking financial concessions and improved products over time.  Through the conjoining of their respective monopoly positions they have been able to successfully eliminate any such risk.  For this reason, the illegal agreement excluding competition has bound them together and persisted unchallenged for at least four years.

**Effects of the Anticompetitive Agreement**

96.    Subsequent to the September 2014 announcement of the Agreement with ETAP, OSI abruptly stopped all marketing and joint sales efforts with Power Analytics, the only provider competing with ETAP for Grid D and M sales and only competitor capable of obtaining NUPIC certification and introducing Real Time products and services in the NUPIC Market.

97.     OSI's dominant market share (in excess of 80%) of the installed base of its Historian Software in the NUPIC Markets, and its position thereby as the "critical bridge" to potential customers for Grid D and M Products prompted Power Analytics to approach OSI in 2011 to discuss a non-exclusive cooperative relationship whereby OSI

-25-

would remain open as that "critical bridge" for Power Analytics' sale of its Grid D and M Products seeking to compete with ETAP and others.

98.    Beginning with this approach in 2011 and up to the consummation of the ETAP OSI Agreement in 2014, multiple meetings, discussions and joint sales efforts took place between OSI and Power Analytics for the purported purpose of expanding the acceptance of Power Analytics' NUPIC Grid D and M Products and plans to certify and introduce Power Analytics' Real Time products to the NUPIC market.  In their own words, OSI expressed that such a program would be of substantial mutual benefit to OSI, Power Analytics and NUPIC customers.

99.    A Power Analytics executive, James Neumann, who prepared presentations and participated in meetings with OSI, left Power Analytics and joined ETAP in 2013. Shortly after Neumann joined ETAP, OSI cut off all discussions with Power Analytics regarding a cooperative relationship in the NUPIC Market.

100.   Prior to 2014, Power Analytics paid fees to OSI to gain access to its PI Systems code in order to assure that Power Analytics' Power Grid Design and Management Products worked seamlessly with OSI's PI System Historian Software. Power Analytics achieved that objective.

101.   Power Analytics and OSI first worked together in 2012 on a Microgrid project for the University of California at San Diego. During and subsequent to that time, Power Analytics' former CEO, Mark Ascolese, had multiple conversations with OSI's

-26-

Founder and CEO Pat Kennedy, during which Kennedy expressed OSI's belief that
Power Analytics' patented Real Time products presented an opportunity to introduce
new products and grow revenue for both Power Analytics and OSI in the stagnant, low
growth NUPIC Market.

102.   In 2012, OSI and Power Analytics personnel participated in meetings
where they discussed strategies to target certain of OSI's existing nuclear customers in
an effort to increase sales for OSI's Historian and Power Analytics' Grid D and M
Products, and which would have enabled Power Analytics to seek and obtain NUPIC
certification for its Real Time Products.

103.   Prior to the announcement of the ETAP OSI Agreement, OSI and Power
Analytics developed strategies for joint sales efforts targeted at large scale nuclear
facility owners such as Exelon, Entergy and Duke among others.

| From: | John Jennings <jjennings@poweranalytics.com> |
|---|---|
| Sent: | Friday, January 20, 2012 3:12 PM |
| To: | Chris Crosby |
| Cc: | Ross Convey; Eric Benson; John Marriott; Doug Whitmer; Rajan Chudgar; MK Kellogg; Ann Moore; Kevin Walsh; Kevin Meagher; Jim VanEtten; Tom Nester; Don Sweeney |
| Subject: | RE: Strategy for Exeleon, Entergy, and Duke for OSI/PI marketing strategies |

Hi Chris:

We had a good call with the group and need to follow-up with the following actions:

**Existing PI and DesignBase Strategy**
1. Setup core ppt presentation for how to better use PI and Power Analytics within plants; Need a powerpoint to show how to better use PI and Power Analytics; including a demonstration of software applications and interface to the PI database – Crosby and Jennings
2. Follow-up call with marketing message and demo for group – Crosby and Jennings
3. Schedule for visiting customers and identify OSI and power Analytics personnel at Exelon Corporate Engineering – Convey (?) and Nester
4. Schedule for visiting customers and identify OSI and power Analytics personnel at Entergy Corporate Engineering – Benson and Sweeney

-27-

104.   OSI's pre-Agreement dealings with Power Analytics, including the above mentioned joint sales calls on specific OSI customers shows that it believed that Power Analytics offered quality products.

105.   The above described plans, strategies and activities, representing an opportunity for Power Analytics and others to actively compete against ETAP in the NUPIC Market, abruptly ended with the implementation of the ETAP-OSI exclusive Agreement.

106.   None of the underlying merits of Power Analytics' product quality or ability of Power Analytics to enhance OSI's financial interest has changed since the companies worked together prior to the agreement.

107.   The only change that has occurred is the agreement with ETAP, after which OSI ceased doing business with Power Analytics in the NUPIC Market.

108.   Additional overtures by Power Analytics to promote its NUPIC products together with OSI or to have OSI recommend Power Analytics' products in NUPIC have been consistently rejected.

109.   In addition, and in furtherance of this illegal exclusionary scheme, after the date of the OSI/Etap agreement, Etap publicly and falsely advertised that Etap was the only NUPIC certified supplier of Grid D and M products, and, on information and belief, repeated this falsehood to a number of Power Analytics customers together with additional false information including stating that Power Analytics was "financially

-28-

unstable", that it had  "lost its NUPIC certification" and that "it would not be in the market for long."  All of these false statements were made in an attempt to drive Power Analytics out of the NUPIC markets and increased ETAP's monopoly share of the NUPIC markets.

110.   This anticompetitive agreement and related actions have had the intended effect and success.  No other competitors have entered or otherwise offered competing products in the NUPIC market and ETAP and OSI have maintained and increased their respective monopoly positions.  Power Analytics, the sole historical market competitor to Etap, has been effectively driven out of the NUPIC markets; it has suffered substantial reductions in revenue and profits, loss of customers and has been completely foreclosed from certifying and offering NUPIC Real Time products into the NUPIC markets.

111.   On information and belief, other than ETAP, neither Power Analytics, nor any other provider of Grid D and M Products and Services has concluded a single sale to any nuclear facility of any competing products and services since the implementation of the ETAP OSI Agreement.

112.   Since the inception of this anticompetitive Agreement, Power Analytics has lost four existing NUPIC Market customers: Duke Energy, Enercon, Atomic Energy of Canada and Energy Northwest, representing more than 35% of its pre-ETAP OSI Agreement installed customer base, who on information and belief, have all switched

-29-

from Power Analytics as a direct result of OSI and ETAP's anticompetitive agreement
and related anticompetitive actions to ETAP.

113.   The combination of OSI's and ETAP's dominant market positions in
NUPIC Grid D and M products and Historian Software respectively, the high barriers to
entry for potential competitors and the collusive agreement to exclude other competitors'
products from access to NUPIC customers have substantially lessened and foreclosed
competition in a substantial portion, if not all, of the relevant product market.

**NUPIC Real Time Product and Service Market**

114.   The OSI ETAP anticompetitive agreement has also foreclosed Power
Analytics' Real Time™ software from over 80% of the NUPIC Market. To achieve full
functionality of Real Time™ software, customers must use it with Power Analytics'
Design Base™. By foreclosing Design Base™ from the NUPIC market, Etap and OSI
have excluded sales by Power Analytics and others of Real Time products in a similar
fashion.

115.   Upon information and belief, to date there have been no Real Time
Products, whether ETAP's current Real Time products, Power Analytics' Real Time
products, or Real Time products from any other competitive source that have sought to
satisfy NUPIC audit and certification requirements.  Thus, despite the need and likely
demand for the enhanced safety and reliability functionality provided by Real Time
products, due to the OSI ETAP Agreement, such products remain unavailable to NUPIC

-30-

customers. Power Analytics has been unable to seek and obtain NUPIC certification for its Real Time Products because the ETAP-OSI anticompetitive agreement described herein has foreclosed virtually all sale opportunities, creating an insurmountable economic barrier to entry. With an available, contestable market share of only 3%, the potential sales are below the level needed to recoup the investment required for certification. Competition in the NUPIC market has been wholly and completely deprived of the ability of such highly valuable, innovative technologies and the reductions of operating costs associated with them by their complete exclusion from the market.

116.   The ETAP/OSI Agreement's exclusivity has resulted in an unreasonable restraint of trade.  ETAP's high market share of 97% in the NUPIC Grid Design Market confirms ETAP's monopoly power in the NUPIC Grid Design Market. The other party to the anticompetitive arrangement, OSI, has a monopoly market share for Historian software used by NUPIC customers in excess of 80%. This arrangement has operated to unreasonably constrain the availability of OSI's entrenched Historian products for use in conjunction with ETAP's competitors NUPIC Grid Design products, foreclosing actual and potential competition to ETAP in 80% of the NUPIC Grid Design Market. The loss of this actual and potential competition has reduced output in the form of new products and functionality, has stifled innovation and customer choice, and has de facto eliminated any source of price competition from this substantial portion of the NUPIC

-31-

Grid Design Market. In addition, the facts alleged clearly establish that Power Analytics was a specific target of OSI and ETAP's anticompetitive conduct as a competitor with the capability of providing both NUPIC certified Grid D and M and Real Time products as alternatives to ETAP as well as an Historian software as an alternative to OSI. OSI and ETAP were successful at reducing to the point of virtual elimination Power Analytics' participation in the NUPIC markets.

117.   There are enormous financial and operational incentives that bind OSI and Etap to this exclusionary agreement and have kept it in place since at least 2014--nearly four years.  The illegal, anticompetitive Agreement between OSI and ETAP has enabled both ETAP and OSI to maintain and/or increase their publicly stated monopoly positions in the NUPIC Markets.

118.   Based on the foregoing factual allegations, the OSI ETAP Agreement constitutes an unreasonable restraint of trade under the antitrust laws.  There is no reasonable, factual justification for such an exclusionary arrangement.  This agreement between sellers of complementary Grid D and M Products linking these products together for marketing and sale to NUPIC Market customers has no cost justification, cannot and does not represent any efficiencies or other benefits to customers, and does not serve to expand output to the NUPIC Market. To the contrary, based on the foregoing factual allegations, the ETAP OSI Agreement constrains competition, raises costs,

-32-

restricts output and was done for the sole and stated purpose of maintaining and increasing each of OSI and ETAP's existing monopoly positions in the NUPIC Market.

B.   **The Schneider ETAP Agreement in Restraint of Trade**

1.   **The Relevant Antitrust Markets**

119.   The relevant antitrust product market that has been unreasonably restrained by an anticompetitive agreement described herein between Defendants Schneider and ETAP is the sale and servicing of Energy Management Systems (EMS) platforms ("EMS platform Market").

120.   The meaning of the term "EMS", has evolved over time. Earlier in time, an EMS was largely considered to be limited to control and data acquisition functions (SCADA). Currently, industry understanding refers to an EMS as a combination or a bundle of integrated components that optimize, supervise and control power, which includes SCADA capabilities (an EMS Platform).

121.   Customers for EMS Platforms have common characteristics. First, they operate in low or medium voltage environments.

122.   Next, EMS Platform customers place a premium on the reliability of their electrical power systems, employing more sophisticated monitoring systems and redundant equipment to prevent the prohibitive costs of power outages or power-related accidents.

123.   Like demands for turnkey systems in other industries, EMS Platforms satisfy unique demands of facility owner/operators. In order to minimize the costly

-33-

prospect of system failures and/or under-performance, end-user customers rely on EMS Platform suppliers able to assume overall responsibility for the near-term and long-run operation for all elements of their electric power grid system, like Schneider. The relevant costs include both system downtime and the costs associated with inefficient operation. The distinguishable demands of EMS Platform consumers is evidenced by the sophistication of the monitoring equipment and levels of redundancy included in their electric power grid systems. As opposed to integrators who specialize in one or more electrical system components, EMS Platform suppliers offer and take responsibility for entire or nearly entire systems.

124.   By 2011, Schneider recognized that in order to compete for the sale of these turnkey solutions, it would need to offer power analytical capabilities as necessary components of the EMS Platforms provided to customers.

125.   The specific equipment, electrical components, configuration, design and installation, and post-installation system monitoring, management and maintenance, that constitute EMS Platforms are turnkey solutions that provide for greater connectivity, efficiency, reliability and safety than would be found in unbundled/non-integrated assembly of similar products by facility owners or contractors deploying a non-turnkey system.

126.   As described by Defendant Schneider in publicly available documents, each EMS platform has three layers, comprising: 1. Power Management applications,

-34-

analytics and related services, 2. Controllers and 3. Connected Products, including, starters, sensors, meters, panels, relays, breakers and similar related equipment.  The Schneider schematic below describes the connectivity of each layer of the EMS Platform.



127.   Apps, Analytics & Services refers to the software, and software services which run the systems.

128.   Power Analytics, ETAP and other Grid D and M Product providers sell products of the kind used to perform certain "Apps, Analytics & Service" functions.

129.   Power Analytics, ETAP and other Grid D and M Product providers provide services that support the software of the kind used to perform certain of these "Apps, Analytics & Service" functions.

130.   Edge Control refers to controllers in addition to power management and automation software and hardware.

-35-

131.  Connected Products refers to a range of electrical equipment, i.e. Grid Elements, including but not limited to, switches, transformers, meters, relays, sensors, starters and related equipment systems that are connected to the grid within the facility.

132.  Defendant Schneider, in explaining its strategy of meeting the demands of its own customers in its own business publications, describes its EMS as automated and integrated systems or platforms comprising software, hardware and related electric power management equipment sold to categories of Commercial Building, Industrial, Information Technology and Infrastructure end-users.

133.  In reorganizing its product offerings to reflect the demand for its EMS Platform customers, Schneider refers to and promotes its EMS offerings as "Ecostruxure Platforms".



-36-

134.   To satisfy safety and regulatory concerns, EMS Platform customers conduct pre-construction studies to assure that building designs and equipment specifications meet recognized standards.

135.   Power Analytics, ETAP and others including SKM, Eaton owned Cyme, DigSilent and PSSE offer competing Grid D and M Products that serve these construction study functions.

136.   While some suppliers, including ETAP, use the term EMS to describe the integrated functionality of more discrete component products, many of which are limited to software suites, the EMS market as used here, and defined by Defendant Schneider, refers to the full bundle of automation, monitoring and control software, hardware and related equipment purchased by facility owner/operators for use as an "EMS Platform." In some cases, EMS Platform suppliers like Schneider refer to the sale of integrated end to end bundles as single "solutions" as distinguished from individual components or sets of components.

**2.  The EMS Platform is a Relevant Antitrust Product Market**

137.   Under the antitrust laws, the process of defining relevant antitrust product markets recognizes that unique market demands may be best met by aggregating or bundling and then jointly selling goods and services that may also be otherwise sold individually. As a result, bundles of goods and services can and often do represent unique and distinct antitrust relevant product markets.

-37-

138.   The aggregation and joint sales of individual goods and services (components) from multiple suppliers, combined and offered for sale by a single supplier, is motivated by market demand for a level of integration and interconnectivity that could not be replicated if the buyer of the bundle were to compile, assemble and install components of the bundle themselves from the several individual suppliers.

139.   In some cases, these benefits are enhanced where the joint products and services require a meaningful amount of post-sale updating, replacement and related services.

140.   In some cases, the bundling of jointly sold products and services are recognized as "Platforms."  In many such cases, such as in the EMS Market here, the demand for bundled sales is sufficiently strong so as to restrict competition to sales among firms that are able to provide a complete or nearly complete bundle or Platform, such as Schneider and competitors such as ABB, Eaton and Siemens.

141.   Suppliers of Platform components, such as ETAP and Power Analytics who provide Grid D and M products, are entirely reliant upon platform suppliers such as Schneider to include their component products as choices for customers in constructing EMS Platforms, otherwise such products will simply be unavailable to all EMS Platform customers.

**Schneider Market Share**

-38-

142.   As described in detail below, Schneider, as the largest EMS Platform provider in North America, since at least 2012 has established and maintained a dominant market share of both the overall EMS Platform Market, and of the submarkets described herein, making Schneider a "critical bridge" to a substantial share of the EMS Platform market for suppliers who provide Grid D and M Products.

143.   Without the Schneider "critical bridge", all competitors, including but not limited to Power Analytics, lack a viable method for selling Grid D and M Products in the EMS Platform Market.

144.    In response to a small, but non-transitory increase in either the initial or longer run total ownership costs of each EMS Platform, there is no plausible basis to expect that facility owner/operators customers would replace an EMS Platform provided by Schneider or another vendor, and buy, assemble, install and integrate the EMS components themselves from several independent suppliers.

145.   Supply of a full- or nearly full-line of products and services, such as the EMS Platforms here, have been repeatedly recognized as relevant antitrust product markets under prevailing law.

146.   Schneider itself, in publicly available documents, has recognized that much like broad-line foodservice distributors, and prescription drug wholesalers, platform providers such as Schneider "Must provide a full complement."

-39-

# DCIM Offer in the market

- Suite providers
  - Must provide a full complement
    - Asset management capabilities
    - Environmental / energy monitoring
    - Data aggregation / reporting as part of its DCIM offering
- Non-Suite and point product providers
  - The offer is a piece or pieces of the DCIM stack
    - But do not bring a full complement to market at this time

147.   In each EMS Platform it offers, Schneider is the party responsible for supplying the turnkey EMS Platform in the form of all of the hardware, software and equipment that will be used in and attached to the facility. The software includes Grid Design Products and Real Time Products. Schneider has control over which other suppliers' products will be offered to customers and ultimately used in the EMS Platform sale, as well as the customer's choice of competing products.

148.   Schneider uses both its own products in each EMS Platform and those of unaffiliated suppliers to complete each of its EMS Platforms.

149.   By virtue of its exclusionary agreement with Schneider described herein, ETAP has become the sole and exclusive supplier of Grid Design and Real Time monitoring and modeling software, components of the EMS Platform sold by Schneider to the exclusion ETAP's competitors.

-40-

150.   Estimates of the size of the EMS Platform Market, Schneider's share of the market and competition from other suppliers is based on analysis from several sources, including industry publications and sources, annual reports of market participants, press releases, company web sites, company presentations (e.g. white papers, shareholder and analyst presentations), proprietary databases, trade press reports, and other sources.

151.   Based on these sources, Schneider accounts for in excess of 50 percent of the overall EMS Platform Market.  As such, Schneider is the dominant supplier in the EMS Platform Market and controls a substantial share of the EMS Platform line of commerce.

152.   Schneider competes with other suppliers of turnkey EMS Platforms. Schneider's competitors include Eaton, Siemens, GE, ABB, Honeywell and other additional smaller competitors.  The non-Schneider portion of the market is fragmented. As a result, none of these Schneider competitors represent a viable alternative by which competitors to ETAP, like Power Analytics and others, could reach a meaningful share of EMS Platform customers with their Grid D and M Products.  For example, Eaton has its own captive suite of grid design and monitoring and modeling software, Cyme, and has no incentive to offer its EMS Platform customers a competitive alternative to its Cyme products.

153.   There are no close substitutes to EMS Platforms. Upon information and belief, in response to a small but non-transitory increase ("SSNIP") in the price of EMS

-41-

platforms, including software supplied by Power Analytics and ETAP, consumers (facility owner/operators) are not expected to accumulate, integrate and obtain post-sale services themselves, rendering a hypothetical price increase profitable for EMS suppliers like Schneider.

154.   At least two facts contribute to Schneider's dominant share of the North America EMS Platform Market. First, Schneider and its parent, Schneider Electric SE, as a result of a wide-ranging pattern of acquisitions, possess the manufacturing capability for virtually all the equipment needed in EMS Platforms. In addition to the companies identified below, in an effort to build a portfolio of established suppliers of EMS components, Schneider also acquired T.A.C. and Wonderware. Schneider has leveraged its own broad portfolio of EMS components with these acquisitions of other leading EMS Platform component suppliers, as depicted in the graphic below taken from a Schneider document:

-42-















- Portfolio has a solid organic growth story, M&A not mandatory
- Focused on disciplined and value-accretive M&A in core of the core business

155.   Second, customers of EMS Platforms often build numerous facilities over time; for example, AT&T has over 450 Data Centers. Companies like Schneider that have served a particular customer have a competitive advantage over other firms with respect each new project and multiple projects over time for the same EMS Platform customer.

156.   The proposed relevant geographic market for the EMS Platform markets described above is no greater than North America. As noted above in Paragraph 71, many components of each EMS Platform require provision of meaningful post-sale services. U.S. EMS Platform suppliers use their own engineers and technicians in

-43-

addition to engaging unaffiliated technical support to meet the on-going scheduled and unscheduled demands of its EMS Platform customers. U.S. EMS Platform customers would not reasonably turn to engineers and support personnel abroad to respond to unscheduled demands, especially those that may require onsite assistance with the complex hardware and software systems.

157.   Even if many of the components in EMS Platforms are substitutable across the U.S. and foreign markets, EMS suppliers without a domestic presence and an established sales and service network are unable, within the requisite period, to discipline a hypothetical small but non-transitory increase in the price of an EMS Platform offered by suppliers like Schneider already serving the U.S. market.

158.   Sales made as components of EMS Platforms or sales to vendors servicing EMS Platforms represent the vast majority, approximately 90 or more percent, of sales opportunities for suppliers of Grid D and M Products.

159.   Of the remaining few potential non-EMS Platform customers, many cannot be reached by direct sales efforts, but require component suppliers bidding through an integrator or a general contractor. Component suppliers incur higher costs to identify such sales opportunities and individually promote their products. These less desirable opportunities account for ten percent or less of the total sales of non NUPIC-certified Grid D and M Products.

-44-

160.   Although Grid D and M products sold as NUPIC-certified Grid D and M products and products sold as components of EMS Platforms are substantially different products, and stand alone NUPIC certified Grid D & M products on the one hand and EMS Platform Products which include non-certified and audited Grid D and G software as components on the other hand, constitute distinct relevant markets for antitrust purposes, sales of Grid D and M products in the NUPIC and EMS Platform markets represent substantially in excess of 80% of the total market for all Grid D and M products sold in the North American geographic market.

### 3.  End User EMS Platform Submarkets

161.   In addition the overall EMS Platform Market, there exist the following separate end user EMS Platform markets identified by Schneider in publicly available documents: (i) the sale and servicing of Energy Management Systems (EMS) platforms for Commercial Buildings (Commercial Buildings EMS Platform Market); (ii) the sale and servicing of Energy Management Systems (EMS) platforms for Data Centers (Data Center EMS Platform Market); (iii) the sale and servicing of Energy Management Systems (EMS) platforms for Industrial (Industrial EMS Platform Market); and (iv) the sale and servicing of Energy Management Systems (EMS) platforms for Infrastructure/Grid (Infrastructure/Grid EMS Platform Market).  As set forth below in greater detail below, Power Analytics asserts as an alternative to the EMS Platform Market the following antitrust product markets.

-45-

162.   Although each end-user EMS Platform provides many of the same functions, the four end-user EMS Platforms are distinguishable from one another based on the configuration, integration and automation of select components. For example, upon information and belief an EMS Platform sold in the Commercial Building Market is not readily substitutable for an EMS Platform sold in the Data Center Market.

163.   For facility owner/operators that require turnkey EMS Platforms, Schneider provides what it refers to as "Ecostruxure Platforms" that serve each distinct end-use markets – (i) Commercial Building, (ii) Data Center, (iii) Industrial, and (iv) Infrastructure/Grid.

164.   Schneider claims in publicly available documents that it has a dominant position in each of the EMS Platform end-user markets.

| Activity in Schneider Electric | Building | IT | Industry | Infrastructure |
|---|---|---|---|---|
| 2015 revenues (€ bn) | 11.9 | 3.7 | 5.7 | 5.4 |
| 2015 Adj. EBITA Margin (%) | 18.0% | 17.6% | 17.1% | 9.1% |
| Worldwide position | #1 | #1 | #2 discrete #4 process | #1 |

Serving our 4 end-markets

165.   While some EMS Platform components are used in more than one end-user platform, the platforms themselves are not substitutable across the four groups of end-users. The branded Ecostruxure Platforms make use of three interactive Schneider

-46-

power management suites of products: Struxureware, SmartStruxure and PowerStruxure. Schneider describes them as follows:

SmartStruxure for Buildings:





Struxureware for Data Centers:



PowerStruxure

-47-



ADMS (Advanced Distribution
Management Software)
recognized by Gartner®
Magic Quadrant

166.   Consumers in each of the four end-user markets identified above, due to the prohibitive costs of power failures or power-related accidents must employ sophisticated power management, monitoring and modeling software of the type supplied by Power Analytics, ETAP and other suppliers.

167.   Customers in each of the four end user markets rely on full line EMS Platform suppliers like Schneider to provide all or nearly all of the components of the EMS Platform as a bundled product, including, Grid Design, Historian, and Real Time management, monitoring and modeling software.

168.   There are no close substitutes to each of the end user EMS Platforms.

169.   Upon information and belief, in response to a small but non-transitory increase ("SSNIP") in the price of an end user EMS Platform, including software supplied by Power Analytics and ETAP, consumers (facility owner/operators) are not expected to accumulate, integrate and obtain products and post-sale services themselves,

-48-

rendering a hypothetical price increase profitable for end user EMS Platform suppliers like Schneider.

170.   EMS Platform competition in each of the end user markets largely reflects competition in the overall market. Schneider's dominance and ability to foreclose competition amongst component suppliers, like that between Power Analytics and ETAP, extends to each of the four end use markets.

171.   For each of these four end user markets, Schneider offers a differentiated platform, as discussed above.

172.   Based on the same post-sale servicing considerations applicable to the EMS Platform Market, the relevant geographic market for each of the EMS Platform end-user markets is not larger than North America.

**Submarket for Commercial Building EMS Platforms**



-49-

173.   The sale and servicing of EMS Platforms to Commercial Buildings is an alternative relevant antitrust product market. Facilities in the Commercial Building EMS Platform market include Healthcare, Hotel, Office and other similar low and medium voltage power system facilities where the prohibitive costs of power failure and/or power-related accidents require high levels of redundancy and more sophisticated monitoring and modeling software.

174.   For consumers in the relevant market, there are no close substitutes for Commercial Building EMS Platforms. Faced with a small but non-transitory increase in the price of Commercial Building EMS Platforms, consumers would not be expected to assemble the components of their own EMS and subsequently to arrange for post-installation services, allowing for a profitable price increase to be imposed by a hypothetical monopolist.

175.   Relying on the same types of sources identified above in estimating the size of the EMS Platform Market, Schneider is considered to be the largest supplier to the Commercial Building EMS Platform Market, accounting for at least 40% of the Commercial Building EMS Platform Market.

176.   Other EMS Platform suppliers identified above also, to varying extents, serve the Commercial Building EMS Platform Market, with Honeywell and Siemens considered to be Schneider's closest rivals.

-50-

## Submarket for Data Center Energy Management Systems



177.   The sale and servicing of EMS Platforms to Data Centers is an alternative relevant antitrust product market. Data Centers are low and medium voltage power system facilities where the prohibitive costs of power failure and/or power-related accidents require high levels of redundancy and more sophisticated monitoring and modeling software.

178.   For consumers in the relevant market, there are no close substitutes for Data Center EMS Platforms. Faced with a small but non-transitory increase in the price of Data Center EMS Platforms, consumers would not be expected to assemble the components of their own EMS and subsequently to arrange for post-installation services, allowing for a profitable price increase to be imposed by a hypothetical monopolist.

179.   Relying on the same types of sources identified above in estimating the size of the EMS Platform Market, Schneider is considered to be the largest supplier to the

Data Center EMS Platform Market, accounting for more than 50% of the relevant market.  Based on well accepted standards, the market is considered to be concentrated.

180.   Other EMS Platform suppliers identified above also, to varying extents, serve the Data Center EMS Platform Market, with Eaton and GE thought to be Schneider's closest rivals.

**Submarket for Industrial Energy Management Systems**



181.   The sale and servicing of EMS Platforms to Industrial facilities is an alternative relevant antitrust product market. The Industrial EMS Platform market includes discrete and continuous process facilities, including Packaging, Machine Building, Food and Beverage, Mining, Metals, Minerals, Oil & Gas facilities, among other similar low and medium voltage power system facilities where the prohibitive costs of power failure and/or power-related accidents require high levels of redundancy and more sophisticated monitoring and modeling software.

-52-

182.   For consumers in the relevant market, there are no close substitutes for Industrial EMS Platforms. Faced with a small but non-transitory increase in the price of Industrial EMS Platforms, consumers would not be expected to assemble the components of their own EMS and subsequently to arrange for post-installation services, allowing for a profitable price increase to be imposed by a hypothetical monopolist.

183.   Relying on the same types of sources identified above in estimating the size of the EMS Platform Market, Schneider is considered to be one of the two largest suppliers to the Industrial EMS Platform Market, where Schneider account for at least 30% of the relevant market.  Based on accepted standards, the market is considered to be concentrated.

184.   Other EMS Platform suppliers identified above also, to varying extents, serve the Industrial EMS Platform Market, with Siemens and ABB thought to be Schneider's closest rivals.

**Submarket for Infrastructure Energy Management Systems**



185.   The sale and servicing of EMS Platforms to Infrastructure facilities is an alternative relevant antitrust product market. Facilities in the EMS Platform market include Water & Wastewater plants, Transportation systems, Electric Generation and Transmission Utility facilities and other similar low and medium voltage power system facilities where the prohibitive costs of power failure and/or power-related accidents require high levels of redundancy and more sophisticated monitoring and modeling software.

186.   For consumers in the relevant market, there are no close substitutes for Infrastructure EMS Platforms. Faced with a small but non-transitory increase in the price of Infrastructure EMS Platforms, consumers would not be expected to assemble the components of their own EMS and subsequently to arrange for post-installation services, allowing for a profitable price increase to be imposed by a hypothetical monopolist.

187.   Relying on the same types of sources identified above in estimating the size of the EMS Platform Market, Schneider is considered to be the largest supplier to the Infrastructure EMS Platform Market, accounting for more than 33% of the relevant market.   Based on accepted standards, the Infrastructure EMS Platform Market is considered to be concentrated.

188.   Other EMS Platform suppliers identified above also, to varying extents, serve the Infrastructure EMS Platform Market, with GE and Siemens thought to be Schneider's closest rivals.

-54-

189.   As evidenced by the use of this published Schneider schematic diagram, the components of Schneider's Industrial and Infrastructure EMS Platforms are more similar to each other than those that comprise the Commercial Building and Data Center EMS Platforms.  Many of the same components of the Industrial EMS Platform are used in the Infrastructure EMS Platform.  Where different products or different version of the same product are used, they are considered comparable in terms of accuracy, requirements, protocols, and nomenclature.  For this reason, in terms of analyzing Schneider's and ETAP's ability to foreclose other component suppliers the Industrial and Infrastructure EMS Platform markets should be considered a single market.

### 4.   Schneider's Pre-Agreement Relationship with Power Analytics as a Competitor to ETAP in the EMS Platform Market

190.   Before entering its anticompetitive agreement with ETAP which occurred in or about 2012, Schneider expressed considerable interest in offering EMS Platform customers choices that would include Power Analytics' Grid Design and Real Time products as platform components.  This is evidenced by, amongst other things the inclusion of Power Analytics' Grid D and M Products in multiple Schneider EMS Platform bids.

191.   In 2010, Power Analytics (then known as EDSA Micro Corporation) met with Schneider personnel in Schneider's Nashville facility where Power Analytics displayed and provided substantial information related to Power Analytics' products.

-55-

192.   August 2010 emails between Power Analytics and Schneider discuss these meetings, including validation that Power Analytics' Grid D and M products would successfully operate within the Schneider EMS Platform.

> It is worth mentioning that my CEO (Mark Ascolese) has spoken with Scott Henneberry from your Power Systems group in Nashville, TN in the past regarding our ability to provide Power Analytics software on top of your ION Enterprise software. I was left with the impression that the lab has evaluated our software in Nashville and both parties agreed that we have no problem integrating our software to your software platform…My CEO and CTO also met with Darryl Smithson, who I believe is your VP Service Sales NA, last week to further discuss our ability to layer Paladin® Live™ on top of Schneider Electric PowerLogic ION Enterprise software.

193.   Schneider was sufficiently confident in Power Analytics' products to consider offering Power Analytics products as a choice to potential customer Bank of America, requesting in 2010 that Power Analytics "provide a price on the BOA Project Team."

194.   Later in 2010, Schneider again included Power Analytics' products as a software choice in discussions regarding a potential, multiple location EMS Platform project for Citibank.

> John Z & I hosted a meeting at Citi Lonestar on 12/15. Lance Bishop presented on Schneider Energy Solutions capabilities. Among the topics discussed was EDSA & its Power Analytics. BJ Butler has an interest in EDSA as long as Schneider is involved…We assured Citi that Schneider can partner w/EDSA [the former name of Power Analytics] at any of the Citi locations.

-56-

195.   Power Analytics continued its efforts to work with Schneider through multiple meetings, discussions and proposals up until the time of the public announcement of the ETAP Schneider agreement in 2012 and thereafter until the formal announcement of Schneider's exclusive "standardization" on ETAP in 2015 on numerous occasions. Schneider has rejected all proposals and requests to include Power Analytics products as components, or as a choice among competing components, in Schneider EMS Platform products sold to customers in each instance, factually confirming the exclusive agreement between ETAP and Schneider.

196.   Similarly, subsequent to the announcement of its agreement with ETAP, Schneider has refused to recommend or use Power Analytics' Grid Design, Real Time and Arc Flash products in any EMS Platform that Schneider has bid on, sold or managed, even though certain project specification requirements could only be satisfied by using Power Analytics' technology and functionality.

**5.  Anticompetitive Agreement between ETAP and Schneider**

197.   The anticompetitive Agreement between ETAP and Schneider alleged herein is not a vertical agreement between a buyer and seller, or a manufacturer and a retailer.  Instead, this is an express anticompetitive agreement between two sellers of components in a bundle offered to EMS Platform customers, where one of the two suppliers controls the contents of the bundle and has substantial market power.

-57-

198.   The Schneider ETAP Agreement, which began at least as early as 2012, and was confirmed in 2015, is an agreement between an EMS Platform provider, Schneider, and an EMS Platform component provider, ETAP, whose purpose was and remains to foreclose and exclude rival sellers from competing with ETAP in the relevant EMS Platform market or submarkets.

199.   On December 11, 2012, Schneider and Etap announced the launch of an "electrical power analysis and simulation module" for data centers.  This "module" combined Schneider's StruxureWare™ with ETAP's Power Grid Design and Management Products. Schneider and ETAP stated this bundling of their respective products was the result of a "cooperative agreement."

200.   This "module" is no more than the joint sale by Schneider of an independent Schneider product and an independent ETAP product, substitutable with those of other competitors, as part of a Schneider EMS Platform.  At its launch, Schneider offered this bundle to customers in the United States and provided EMS Platform customers no alternative choice to ETAP's products sourced from other competitors to ETAP.

201.   In April 2013, ETAP and Schneider again met at Schneider's facility in Tennessee to discuss an expansion of their express "cooperative agreement", such meeting was discussed in an email string with the Subject Line "Re: Meeting ETAP".

-58-

202.   ETAP described the meeting as "a high level strategic agreement to work together with the primary focus on DC. [The Data Center EMS Platform Market] DC (sic).  Today we are here in TN and our intention is to *expand our initial arrangement*."

203.   Beyond Schneider's exclusive reliance on ETAP's Grid D and M Products, the ETAP Schneider Agreement was confirmed as an exclusive and sole-sourced arrangement with ETAP, excluding other competitive alternatives across all EMS Platforms and Platform Submarkets with the announcement in 2015 that Schneider had "standardized" all of its EMS Platform Grid D and M Products components on ETAP products.

204.   On information and belief, the term "standardized" within this industry and relevant market means that all EMS platform Products offered by Schneider would **only** include ETAP Grid Design and Management and Real Time products as components to the complete and total exclusion of products offered by ETAP competitors, and that customers would be offered no other choice of competing products in the Schneider EMS Platform bundle. In addition, such "standardization" means that all of the Schneider engineers and support personnel that provide services for EMS systems would only have access to, be trained to use, and support ETAP Products for the design of grid systems, the maintenance of grid systems, and for performing the required periodic changes, upgrades and audits to the designed systems ("Engineering Services"), thereby

-59-

"locking up" the EMS Platform customer to ETAP products for the life of the Platform.

Such exclusivity is described in the following Schneider document:

# Schneider Electric Standardizes on ETAP Across its Services Division

Global leader in engineering services standardizes on ETAP software for its electrical engineering design, analysis & operation services

**IRVINE, Calif. – May 27, 2015** — Schneider Electric, a global leader in energy management and engineering solutions has chosen ETAP Power System Enterprise Solution as its strategic platform for its engineering services business. Schneider Electric recently completed a significant purchase of ETAP suite of power system software which is currently being deployed within the company's Engineering Services business.

Schneider Electric decided to standardize the use of ETAP for its projects in order to leverage the advanced, next-generation technology of the integrated ETAP software suite to further increase its productivity through greater efficiencies. ETAP provides Schneider Electric higher design reliability and quality, rule-based analysis, and automation capabilities that will help to optimize and fast track project engineering design and analysis processes.

"ETAP is a proven technology leader and it is a strategic decision for Schneider Electric to standardize on ETAP. ETAP is helping us to create a highly efficient environment for power system modeling, design, analysis, and operation," said Udaya Devineni, Senior Vice President of Schneider Electric US Services. "Our deployment is already reducing costs and improving productivity across our business. We look forward to expanding the use of ETAP across all our projects and enhance our partnership with ETAP."

205.   Schneider acknowledged the exclusivity of the Schneider ETAP agreement in its announced plans to "expand[] the use of ETAP *across all our projects* and enhance our partnership with ETAP", thereafter extending across all EMS Platform Markets in addition to data centers.

206.   Schneider also confirmed such exclusivity in *ETAP produced* videos publicly available on YouTube that "ETAP was the only choice." https://www.youtube.com/watch?v=aNhIOYSfaLc

-60-



207.   This "standardization" is, factually, an exclusionary mechanism that has resulted in an anticompetitive foreclosure of competition and a "lock out" of actual and potential competitors capable of offering Grid D and M products as components of Schneider's EMS Platforms, including Power Analytics.

**Harm to Competition**

208.   This foreclosure has harmed competition by substantially foreclosing and excluding competition from lower cost, and more efficient and innovative Grid D and M products that would otherwise be available to EMS Platform customers from competing component suppliers, including Power Analytics.

209.   On information and belief, this exclusive agreement comes at a high cost to competition and to customers in the EMS Platform Market. First, Power Analytics'

-61-

competing products and, on information and belief, the competing products of other competitors to ETAP, have consistently been priced significantly below those of ETAP. Second, at least Power Analytics' competing products offer automated system auditing, automated system change testing and visualization, and automated safety auditing and similar functions that substantially reduce the need for, and high costs associated with, expensive manual studies that must be performed by Schneider engineering staff.  These manual studies substantially raise the post-sale costs of ownership for Schneider EMS Platform customers and provide Schneider with substantial additional profits derived from such unnecessary, high cost Engineering Services.  On this basis alone, Schneider reaps substantial financial benefits by the exclusion of competition from Power Analytics and other ETAP competitors. This represents a substantial incentive for Schneider to maintain and continue its exclusive agreement with ETAP; an exclusivity which eliminates any alternative for its EMS Platform customers which might substantially reduce or eliminate its Engineering Services revenues and profits.

210.   By excluding lower cost competition, end users have paid more for EMS Platforms then they would have absent the ETAP Schneider anti-competitive agreement.

211.   For example, one competitor's, Power Analytics', competing products have the ability to predictively model the potential incidence of arc flash events.

212.   Traditionally, arc flash hazards have been identified in the design phase of facilities, and then require periodic recurring follow up studies conducted by teams of

-62-

engineers that run into the hundreds of thousands of dollars for each individual and repetitive arc flash study.

213.   By locking Power Analytics' products out of the EMS Platform Market, Schneider is able to gain revenues and profits from manual arc flash studies that end users would need not incur if they are to use Power Analytics' advanced patented arc flash products.

214.   This has harmed competition by raising the total cost of ownership for EMS Platform purchasers, and blocking technological advancements that would improve efficiency and safety of end users' facility grids.

215.   In 2016, additional ETAP internal documents acknowledged the exclusivity and foreclosure of competition made possible by the Schneider ETAP Agreement.

216.   ETAP internal correspondence states that "Both SEL and SE [*Schneider Electric*] *will be only looking at ETAP for RT PSMS [Real Time Power System Monitoring Software] software and integration support of our software*."

217.   Through the implementation of the Schneider ETAP Agreement, ETAP has effectively realized its stated goal, admitted in corporate documents in 2013, to focus on methods to "kill competition" in the market by foreclosing named competitors including Power Analytics, Cyme (Eaton), DigSilent, PSSE and others.   Through its exclusive anticompetitive agreement with Schneider it has achieved that express goal and has

-63-

eliminated all competition to its products in a substantial line of commerce –more than 50% of the EMS platform market.

218.    As described in detail above, this Schneider-ETAP Agreement has harmed competition by foreclosing competitors, including Power Analytics, from a substantial share of commerce in the supply of Power Grid D and M Products to the EMS Platform Market.

219.   ETAP and Schneider each have powerful incentives binding them to this anticompetitive exclusivity mechanism in the EMS Platform Market.  This agreement enables ETAP to capture for itself Schneider's dominant 50+% share of the EMS Platform Market and foreclose the risk of any potential competitive component Grid D and M products and Real Time Products replacing ETAP or otherwise challenging its market share on competitive terms, such as lower prices, innovation, greater functionality, or better service to EMS Platform customers.  Schneider is also bound by powerful incentives to maintain and continue its exclusive agreement with ETAP; an exclusivity which eliminates any competitive alternative to ETAP which would, as described above, which would dramatically reduce or eliminate the substantial revenue and profits Schneider is able to extract from customers through its manual Engineering Services.

220.   By and through their anticompetitive agreement, both ETAP and Schneider have been able to successfully eliminate any such risk.  For this reason, the illegal

-64-

agreement excluding competition has bound them together and persisted unchallenged since at least 2012.

221. Based upon the foregoing factual allegations, the ETAP Schneider Agreement constitutes an unreasonable restraint of trade under the antitrust laws. There is no reasonable, factual justification for such a sole source arrangement. This agreement between sellers of complementary Grid D and M Products linking these products together for marketing and sale in a bundle and making ETAP the exclusive Grid D and M Product supplier to EMS Platform Customers has no cost justification, cannot and does not represent any efficiencies or other benefits to the customers, and does not serve to expand output to the EMS Platform Market. To the contrary, based on the foregoing factual allegations, the ETAP Schneider Agreement constrains competition, raises costs, restricts output and was done for the sole and stated purpose of eliminating all competitors of ETAP from the EMS Platform Market line of commerce controlled by Schneider.

**Antitrust Standing**

222. Power Analytics has standing under the prevailing law to bring the claims set forth in this Complaint related to the illegal anticompetitive agreement between OSI and ETAP set forth in detail herein, which has unreasonably and restrained and foreclosed competition in a substantial portion of the line of commerce of NUPIC Grid Design and Real Time Product markets from at least 2013 through the present. Power

-65-

Analytics, as a competitor to ETAP in such market, has been foreclosed and harmed by such illegal activities and thereby has standing to contest such illegal actions and seek injunctive relief and damages for losses it incurred due to OSI's and ETAP's illegal acts.

223.   Power Analytics has standing under the prevailing law to bring the claims set forth in this Complaint relating to the illegal Agreement between Schneider and ETAP set forth in detail herein which has unreasonably restrained and foreclosed competition in a substantial portion of the line of commerce of the EMS Platform Market and Sub-Markets from at least 2012 through the present. Power Analytics as a competitor to ETAP in the sales of competing component products for EMS Platforms has been foreclosed and harmed by such illegal activities and thereby has standing to contest such illegal actions and seek injunctive relief and damages for losses it incurred due to ETAP's and Schneider's illegal acts.

### C. Violation of the North Carolina Unfair and Deceptive Trade Practices Act

### Unfair and Deceptive Trade Practices by Schneider and ETAP

224.   Many of the allegations set forth above herein support Plaintiff's claim that the collusive actions undertaken by OSI and ETAP violate the North Carolina Unfair and Deceptive Trade Practices Act, ("UDTPA).

225.   ETAP and OSI's agreement to improperly and unreasonably limit the ability of Power Analytics to compete fairly and openly with ETAP for nuclear facility

-66-

customers and to offer for sale and sell such customers its lower cost, technologically superior products is a violation of UDTPA.

226.   ETAP specifically stated its goal, and took specific actions in furtherance of this goal, to "kill competition" from Power Analytics and other potential competitors.

227.   In order to do so, it entered an agreement with OSI that excluded Power Analytics from the ability to compete for sales of its lower priced, technologically superior products.

228.   For ETAP, holder of a commanding 97% monopoly share of NUPIC Grid Design, the Agreement with OSI, holder of a commanding 80% plus monopoly share of Historian software, precluded Power Analytics from the "critical bridge" to NUPIC customers.

229.   ETAP's exclusion has proven successful, utilizing the OSI-ETAP exclusivity agreements, as well as false statements and disparagement to preclude Power Analytics from competing for NUPIC sales.

230.   On information and belief, ETAP falsely advertised and told customers that Power Analytics had lost its NUPIC certification.

231.   On information and belief, ETAP falsely told customers that Power Analytics lacked the financial ability to perform as a supplier to NUPIC market customers and that Power Analytics would soon withdraw from the NUPIC Market.

-67-

232.   ETAP's exclusion of Power Analytics has allowed it to maintain its overwhelming 97% market share without competing on the basis of lower prices and better products and services and has avoided the expenditures required to deliver Real Time products by excluding them from availability to customers in the NUPIC Market.

233.   For OSI, the Agreement with ETAP has enabled it to maintain its monopoly (greater than 80%) share in the NUPIC Historian market.

234.   OSI's corporate documents confirm that it pursues a strategy to enter partnerships that will allow it to "lock out competition." Its agreement with ETAP is an example of the successful implementation of such strategy.

235.   By excluding Power Analytics from sales of its Grid Design and Real Time product in NUPIC, OSI has eliminated the competitive threat posed by Power Analytics' competing Historian software, thereby protecting its long-entrenched, 80% plus share of NUPIC Historian sales.

236.   This near total exclusion of competition effectuated by the agreement between OSI and ETAP is an unfair and deceptive trade practice and violates the UDTPA.

**Unfair and Deceptive Trade Practices by Schneider and ETAP**

237.   Many of the allegations set forth above herein support Plaintiff's claim that the collusive actions undertaken by Schneider and ETAP violate the UDTPA.

-68-

238.   In order to keep Power Analytics from fairly competing with ETAP on the bases of price technology, functionality and service ETAP entered an agreement with Schneider to foreclose Power Analytics' ability to offer its products as components in Schneider's EMS Platform which represents in excess of 50% of the EMS Platform market.

239.   ETAP and Schneider's Agreement that Schneider would "standardize on" ETAP, meaning "exclusively use" only ETAP products unfairly and deceptively foreclosed Power Analytics' lower priced, technologically advanced products Grid D and M Products and Real Time products from access to customers representing more than 50% of the EMS platform Market, provided ETAP an uncontested 50+% market share and effectively removed any competitive threat to ETAP's market dominance.in providing its products as components to EMS platforms.

240.   Schneider by and through this same agreement with ETAP, unfairly and deceptively, as set forth in greater detail above, has effectively eliminated the potential for competitors of ETAP to offer Schneider's EMS Platform customers alternative products that would automate service and support functions and would eliminate the need for customers to utilize Schneider's high cost manual Engineering Services. Such a competitive outcome would substantially reduce both Schneider's revenues and profits as well as the costs of post-sale ownership to EMS platform customers.   Schneider's agreement with ETAP was intended to and did conceal from and deprive EMS Platform

-69-

customers of the substantial cost benefits of alternative Grid D and M and Real Time products, such as those offered by Power Analytics.  Such concealment and withholding of information and products constitutes an unfair and deceptive trade practice under North Carolina law.

241.   The North Carolina Unfair and Deceptive Trade Practices Act, ("UDTPA"), "provides that 'unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."[13]

242.   The substantive portions of the UDTPA are "reproduced *verbatim* from § 5 the Federal Trade Commission Act 'FTCA'".[14]

243.   The similarity in language between the UDTPA and FTC Act was not accidental, and therefore it is appropriate for courts to look to decisions interpreting the FTC Act as guidance. The North Carolina Supreme Court has held that "Because of the similarity in language, it is appropriate for us to look to the federal decisions interpreting the FTC Act for guidance in construing the meaning of G.S. § 75-1.1. *Hardy v. Toler*, 288 N.C. 303, 218 S.E. 2d 342 (1975); *see generally* Note, 12 Wake Forest L. Rev. 484 (1976).[15]

---

[13] N.C.G.S. § 75-1.1(a).

[14] *ITCO Corp. v Michelin Tire Corp., Commercial Div.*, 722 F.2d 42, 48 (4th Cir. 1983) (*cert. denied* 469 US 1215 (1985).

[15] *Johnson v. Phoenix Mt. Life Ins. Co.*, 300 N.C. 247, 253 (N.C. 1980).

-70-

244.   One does not need to state a claim for violation of the Sherman Act in order to state a claim for violation of the UDTPA. Unfair methods of competition prohibited by Section 5 of the FTC Act "are not confined to those that were illegal at common law or were condemned by the Sherman Act."[16] To the contrary Congress specifically "left the concept flexible to be defined with particularly by the myriad of cases from the field of business."[17]

245.   The FTC Act "was designed to supplement and bolster the Sherman Act and the Clayton Act (*see Federal Trade Commission v. Beech-Nut Co.*, 257 U.S. 441, 453) -- to stop in their incipiency acts and practices which, when full blown, would violate those Acts (*see Fashion Guild v. Federal Trade Commission*, 312 U.S. 457, 463, 466), as well as to condemn as 'unfair methods of competition' existing violations of them. *See Federal Trade Commission v. Cement Institute*, 333 U.S. 683, 691.[18]

## COUNT I

### Violation of Section One of the Sherman Act – ETAP and OSI

246.   Power Analytics incorporates by reference the allegations set forth in all previous Paragraphs of this Complaint as though fully set forth herein.

247.   ETAP and OSI's conduct violative of Section 1 of the Sherman Act is stated with greater specificity above, including but not limited to Paragraphs 59-118.

---

[16] *FTC v. Motion Picture Ad. Serv. Co.*, 344 US 392, 394-395 (1953).

[17] *Id.* (citing *Federal Trade Commission v. Keppel & Bro.*, 291 US 304, 310-312 (1934)); *De Gorter v. Federal Trade Commission*, 244 F.2d 270, 272, n. 8 (9th Cir. 1957) (same).

[18] *FTC v. Motion Picture Ad. Serv. Co.*, 344 US at 394.

-71-

248.   The ETAP OSI Agreement in restraint of trade has existed since at least 2013.

249.   The ETAP-OSI Agreement illegally restrains trade in two product markets: (i) the NUPIC Grid Design market and (ii) the NUPIC Real Time market.

250.   The relevant geographic market is North America.

251.   As alleged in detail in Paragraphs 59-118 the ETAP OSI Agreement has had a direct, substantial adverse effect on competition including (i) foreclosing competition from lower cost, higher quality products and services in those markets; (ii) reducing customer choice within those markets; and (ii) foreclosing innovation in those markets, and (iv) reducing consumer welfare through the above adverse effects.

252.   ETAP and OSI have no *bona fide* pro-competitive justifications for their anticompetitive agreements, and any business justifications for these agreements are decidedly outweighed by the agreements' adverse effect on competition in the relevant markets.

253.   The ETAP-OSI Agreement, has reduced Power Analytics' sales volume and consequent market share to a level significantly lower than it would have been in the absence of the Agreement.

254.   The ETAP-OSI Agreement has foreclosed Power Analytics from a substantial share of each of the relevant product markets and relegated Power Analytics

-72-

to a small subset of the market, thereby hindering its ability to compete in the NUPIC Market.

255.   The ETAP-OSI Agreement has been successful for ETAP and OSI, who now enjoy and will continue to enjoy control of the markets for the products they offer, the ability to exclude competition and control prices, unchecked by the ability of customers to look elsewhere for the same or superior, innovative products, at lower prices.

256.   The ETAP-OSI Agreement involves a substantial level of interstate commerce.

257.   The ETAP-OSI Agreement violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

258.   As a direct, foreseeable, and proximate result of ETAP and OSI's exclusionary, anticompetitive conduct, Power Analytics has been damaged by loss of past and future sales and profits, the inability to develop economies of scale to permit it to compete in the market, and the inability to develop and offer new innovative products, all in amounts to be proven at trial.

259.   ETAP and OSI's wrongful actions are tortious, are in violation of law and have caused substantial damages to Power Analytics in an amount subject to proof at trial. In addition, Power Analytics is entitled to recover under the law three times its actual damages.

-73-

# Count II

## Violation of Section One of the Sherman Act – ETAP and Schneider

260.   Power Analytics incorporates by reference each preceding paragraph as if fully restated herein.

261.   The ETAP Schneider Agreement in Restraint of Trade is described in greater detail above, including but not limited to Paragraphs 119-221.

262.   The ETAP Schneider Agreement in Restraint of Trade has been in effect since at least 2012.

263.   The relevant antitrust product market that has been unreasonably restrained by an anticompetitive agreement between Defendants Schneider and ETAP is the sale and servicing of Energy Management Systems (EMS) platforms ("EMS platform Market").

264.   Alternatively, the relevant antitrust product markets that have been unreasonably restrained by an anticompetitive agreement between Defendants Schneider and ETAP are: (i) The sale and servicing of EMS Platforms to Commercial Buildings; (ii) The sale and servicing of EMS Platforms to Data Centers; (iii) The sale and servicing of EMS Platforms to Industrial facilities; (iv) The sale and servicing of EMS Platforms to Infrastructure facilities; and (v) The sale and servicing of EMS Platforms to Industrial and Infrastructure facilities

265.   The relevant geographic market is North America.

-74-

266.   But for this Agreement, Power Analytics would be able to compete on the merits of its Grid Design and Real Time Products for EMS systems, including on the basis of price, innovation and service.

267.   This foreclosure of competitors, including but not limited to Power Analytics, has harmed competition by denying end use customers access to price competition and innovative products offered by Power Analytics and other competitors for the sale of Power Grid D and M Products to the EMS Platform Market.

268.   ETAP and Schneider have no *bona fide* pro-competitive justifications for these anticompetitive agreements, and any business justifications for these agreements are decidedly outweighed by the agreements' adverse effect on competition in the relevant markets.

269.   The ETAP Schneider Agreement has reduced Power Analytics' sales volume and consequent market share to a level significantly lower than it would have been in the absence of these agreements. This anticompetitive agreement has foreclosed Power Analytics from a substantial share of each of the relevant antitrust product markets and relegated Power Analytics to a small subset of the market, thereby stunting its competitive viability.

270.   This anticompetitive Agreement has been successful for ETAP and Schneider, who now enjoy and will continue to enjoy control of the market, the ability

-75-

to exclude competition and control prices, unchecked by the ability of customers to look elsewhere for the same or superior, innovative products, at lower prices.

271.   This Agreement involves a substantial level of interstate commerce.

272.   This Agreement violates Section 1 of the Sherman Act, 15 U.S.C. § 1.

273.   As a direct, foreseeable, and proximate result of ETAP and Schneider's exclusionary, anticompetitive conduct, Power Analytics has been damaged by loss of past and future sales and profits, the inability to develop economies of scale to permit it to compete in the market, and the inability to develop and offer new innovative products, all in amounts to be proven at trial.

274.   ETAP and Schneider's wrongful actions are tortious, are in violation of law and have caused substantial damages to Power Analytics in an amount subject to proof at trial. In addition, Power Analytics is entitled to recover under the law three times its actual damages.

## Count III

## Violation of the Cartwright Act – All Defendants

275.   Power Analytics incorporates by reference the allegations set forth in each preceding Paragraph of the Complaint as though fully set forth herein.

276.   Based on the factual statements cited above in support of Counts I and II, Defendants' conduct violative of Section 1 of the Sherman Act constitutes a violation of the Cartwright Act.

-76-

## Count IV

## Violation of Section 2 of the Sherman Act

## Monopolization and Attempted Monopolization - ETAP

277.   Power Analytics incorporates by reference the allegations set forth in all previous Paragraphs of the Complaint as though fully set forth herein.

278.   ETAP has monopoly power in the NUPIC Grid Design Market.

279.   ETAP's publicly stated 97% market share demonstrates the existence of its monopoly power in the NUPIC Grid Design Market.

280.   The NUPIC Grid Design Market contains significant barriers to entry for actual and potential competitors of ETAP, including the high cost of initial and recurring NUPIC audits, and the "critical bridge" role that OSI plays in the Market.

281.   ETAP's stranglehold on the nuclear market – of which ETAP's arrangement with OSI is a material cause – has made it impossible for Power Analytics or any other competitor to obtain the economies of scale necessary to offer existing, new and innovative products to customers in the NUPIC Grid Design Market.

282.   Further, ETAP's ability to successfully sell its lower quality, higher priced NUPIC Grid Design Products demonstrates that it has the power to control pricing.

283.   ETAP's exclusionary agreement with OSI demonstrates that ETAP has the power to exclude competitors and potential competitors such as SKM, DigSilent, Cyme,

-77-

PSSE, Power Analytics and others in the NUPIC Grid Design Market and to exclude

potential entrants to the NUPIC Real Time market.

284.   This exclusionary Agreement has allowed ETAP to maintain and enhance

its monopoly power has maintained and furthered its monopoly power through means

other than competition on the merits.

285.   ETAP's exclusionary Agreement constitutes predatory conduct that

violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

286.   Alternatively, if ETAP has not achieved a monopoly in the NUPIC Grid

Design Market, its anticompetitive conduct constitutes an attempt to monopolize.

287.   Because of the longstanding exclusion, and longstanding high market

share, the exclusionary Agreement provides ETAP a dangerous likelihood of achieving

a monopoly in the NUPIC Grid Design Market.

288.   Both competition in the NUPIC Grid Design Market, and Power Analytics

as a competitor, have been harmed by such conduct identified above.  Further, ETAP's

conduct has harmed consumers and potential consumers in the NUPIC Grid Design and

NUPIC Real Time Markets. The anticompetitive effects of ETAP's conduct outweighs

any possible procompetitive justifications for its actions.

289.   As a direct, foreseeable, and proximate result of ETAP's exclusionary,

anticompetitive conduct, Power Analytics has been damaged by loss of past and future

-78-

sales and profits, the inability to develop economies of scale to permit it to compete in the market, and inability to offer new and innovative products.

290.   ETAP's wrongful actions are tortious, are in violation of law and have caused substantial damages to Power Analytics in an amount subject to proof at trial. In addition, Power Analytics is entitled to recover under the law three times its actual damages.

## Count V Violation of the North Carolina Unfair and
## Deceptive Trade Practices Act – All Defendants

291.   Power Analytics incorporates the allegations set forth in each preceding Paragraph of the Complaint as if fully set forth herein.

292.   This claim is brought to recover treble damages for Defendants' violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. §§75-1, 75-1.1, 75-2, and 75-2.1

293.   Based on the allegations in Paragraphs 224-245, as well as the factual statements cited above in support of Counts I-IV, Defendants' conduct violates the North Carolina Unfair and Deceptive Trade Practices Act.

294.    As a proximate result of Defendants' violations of the North Carolina Unfair and Deceptive Trade Practices Act, Power Analytics has been substantially injured in its business and property and is likely to be injured further in its business and property. Unless Defendants are enjoined from further violations of the North Carolina

-79-

Unfair and Deceptive Trade Practices Act, Power Analytics will continue to suffer injury from the illegal acts of Defendants.

295.   Defendants' wrongful actions are in violation of law and have caused substantial damage to Power Analytics in an amount subject to proof at trial.  In addition, Power Analytics seeks and is entitled to recover under the law punitive damages under North Carolina law.

## Count VI

## Violation of the California Unfair Competition Law – All Defendants

296.   Power Analytics incorporates the allegations set forth in each preceding Paragraph of the Complaint as if fully set forth herein.

297.   Based on the factual statements cited above in support of Counts I-V, Defendants' conduct violates the California Unfair Competition Law.

## COUNT VII

## Tortious Interference with Prospective Economic Advantage

298.   Power Analytics incorporates the allegations set forth in each preceding Paragraph of the Complaint as if fully set forth herein.

299.   Power Analytics had reasonable opportunity to sell its products in the markets identified in EMS Platform Market, EMS Platform end user alternative markets and the NUPIC Grid Design and NUPIC Real Time Markets.

-80-

300.   Defendants intentionally interfered with Power Analytics' ability to sell and service its Grid D and M, NUPIC Grid Design and NUPIC Real Time Products in the relevant markets described herein.

301.   Defendants' conduct has caused Power Analytics to lose sales to at least the following entities with whom Power Analytics had pre-existing commercial relations: Duke Energy, Enercon, Atomic Energy of Canada and Energy Northwest.

302.   Defendants' conduct proximately harmed Power Analytics in the form of lost contracts, lost sales and profits, and lost opportunities to expand its business with purchasers and operators of Power Grids. Defendants' conduct has caused substantial damages to Power Analytics in an amount subject to proof at trial. In addition, Power Analytics seeks and is entitled to recover under the law punitive damages in addition to compensatory damages under common law in the amount of three times compensatory damages.

## COUNT VIII

### Civil Conspiracy – All Defendants

303.   Power Analytics incorporates that allegations set forth in each preceding Paragraph as if fully set forth herein.

304.   ETAP and OSI knowingly entered in a combination or conspiracy to harm Power Analytics' business.

-81-

305.   ETAP and OSI each took overt acts in furtherance of this conspiracy. These overt acts, described above, were either illegal or legal but performed in an illegal manner.

306.   ETAP and Schneider knowingly entered in a combination or conspiracy to harm Power Analytics' business.

307.   ETAP and Schneider each took overt acts in furtherance of this conspiracy. These overt acts, described above, were either illegal or legal but performed in an illegal manner.

308.   This conduct proximately harmed Power Analytics in the form of lost contracts, lost sales and profits, and lost opportunities to expand its business with purchasers and operators of Power Grids. Defendants' conduct has caused substantial damages to Power Analytics in an amount subject to proof at trial.

-82-

**PRAYER FOR RELIEF**

WHEREFORE, Power Analytics prays for judgment and seeks relief against Defendants as follows:

1.      For a judgment that Defendants have violated and continue to violate Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1;

2.      For a judgment that ETAP has violated and continues to violate Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2;

3.      For a judgment that Defendants violated and continue to violate the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat § 75-1-75-2.1;

4.      For a judgment that Defendants violated and continue to violate the California Business and Professions Code §§ 17200-17209;

5.      For a judgment that Defendants violated and continue to violate the California Business and Professions Code § 16720;

6.      For a judgment that Defendants tortiously interfered with Power Analytics' prospective business advantages;

7.       For a judgment against each Defendant as a participant in a civil conspiracy;

8.      For an award of all damages sustained by Power Analytics as the result of Defendants' violations of the Sherman Antitrust Act, trebled as authorized by law;

-83-

9.      For an award of all damages sustained by Power Analytics as the result of Defendants' violations of the North Carolina Unfair and Deceptive Trade Practices Act, trebled as authorized by law;

10.     For an award of all damages sustained by Power Analytics as the result of Defendants' violations of Cal. Bus. & Prof. Code § 17200, trebled as authorized by law;

11.     For an award of disgorgement as the result of Defendants' violations of Cal. Bus. & Prof. Code § 17200;

12.     For an award of all damages sustained by Power Analytics as the result of Defendants' violations of Cal. Bus. & Prof. Code § 16700, et seq., trebled as authorized by law;

13.     For an award of all damages sustained by Power Analytics as the result of Defendants' tortious interference with prospective business advantage, and an award of punitive damages;

14.      For an award of all damages sustained by Power Analytics as the result of Defendants' civil conspiracies;

15.     For equitable relief against Defendants enjoining the aforesaid acts of monopolization, attempted monopolization, agreements in restraint of trade, by Defendants, and as applicable, their officers, agents, servants, employees, subsidiaries, successors, assigns, and all other persons acting in concert or participating with each of

-84-

them, including related individuals and entities, customers, representatives, dealers, and distributors;

16. For an award of attorneys' fees pursuant to 15 U.S.C. § 15, N.C. Gen. Stat. § 75-1.1, Cal. Bus. & Prof. Code § 17200, Cal. Bus. & Prof. Code §16720 or as otherwise permitted by law;

17. For all costs of suit; and

18. For such other and further relief as the Court may deem just and proper.

-85-

**DEMAND FOR JURY TRIAL**

Power Analytics demands a trial by jury for all Counts in this action.

DATED: January 11, 2018                    Respectfully Submitted,

                              By:

                                   */s/* Robert F. Ruyak
                                   Robert F. Ruyak (*pro hac vice*)
                                   robertr@ruyakcherian.com
                                   Richard A. Ripley (*pro hac vice*)
                                   rickr@ruyakcherian.com
                                   Arthur T. Farrell (*pro hac vice*)
                                   tedf@ruyakcherian.com
                                   Amadou K. Diaw (*pro hac vice*)
                                   amadoukd@ruyakcherian.com
                                   1700 K St. NW, Suite 810
                                   Washington, D.C. 20006
                                   Telephone: (202) 838-1560

                                   Korula T. Cherian (SBN 133,967)
                                   sunnyc@ruyakcherian.com
                                   1936 University Ave, Suite 350
                                   Berkley, California 94704
                                   Telephone: (510) 944-0190

                                   Don F. Livornese (SBN 125,934)
                                   donl@ruyakcherian.com
                                   222 N. Sepulveda Blvd, Suite 2000
                                   El Segundo, California 90245
                                   Telephone: (310) 586-7689

                                   Attorneys for Plaintiff
                                   *Power Analytics Corporation*

-86-

-1-